Tommy TREVINO, Appellant,

v.

The STATE of Texas.

No. 2360–01.

Court of Criminal Appeals of Texas,
En banc.

Feb. 26, 2003.

Scott Brown, Fort Worth, for Appellant.

Michael R. Casillas, Assistant District Attorney, Fort Worth, Matthew Paul, State's Attorney, Austin, for the State.

### OPINION

PER CURIAM.

Tommy Trevino shot and killed his wife. He argued the shooting was in self-de-

fense, but the jury rejected this argument and convicted him. At punishment, he requested and was denied a jury charge on sudden passion. We agree with the Court of Appeals that the judge erred in denying this charge, and that the judgment of conviction should be reversed.

## I. Facts and Procedural History

### A. Guilt/Innocence

The shooting occurred on the Monday after Thanksgiving, 1997. Exactly what happened that day between Trevino and his wife Michelle was the subject of heated debate at trial. The State's witnesses portrayed the incident as a cold-blooded murder by a controlling and abusive husband who, after the murder, staged the crime scene to look like self-defense. The defense argued that the shooting occurred in self-defense after a heated argument and struggle.

Members of Michelle's family testified that Trevino was controlling and Michelle was afraid of him. He would go to nightclubs without Michelle. Eventually Michelle asked Trevino for a divorce, and after that, Trevino would buy her flowers and take her out. But by the date of the offense, Michelle was gaining independence, and had a job interview that very afternoon.

Detective Thomas Boetcher, the lead detective in the case, testified that the crime scene he found did not match the story Trevino told him. Trevino told Detective Boetcher that he and Michelle had been having an argument because she found some phone numbers of some other women in his wallet. They were in the living room, and she confronted Trevino with a .38 caliber revolver. She pointed it at him and pulled the trigger twice, which scared Trevino, but the gun did not fire. Trevino then went to the bathroom and flushed the phone numbers down the toilet. At some point he retrieved his 9 millimeter pistol. As he was leaving the bathroom, Michelle fired a shot at him. According to Trevino, the shot was fired in the bathroom. At this point, the two began struggling over the two guns. Trevino said that Michelle got shot, but they continued to struggle, and then another shot was fired, and finally another.

But Boetcher testified that, while Trevino said that Michelle shot him in the bathroom, there was no bullet hole inside the bathroom. Boetcher also testified that he found a 9 millimeter in the living room and a .38 caliber revolver in the hallway near the bathroom, about five feet from Michelle's body. The 9 millimeter had been taken apart, with the clip removed, but Trevino had not told Boetcher that he had done that. Boetcher felt that the .38 caliber had no evidentiary value to the case—that it had not been a part of the shooting. Boetcher conceded that Trevino granted consent to search the house and made no attempts to flee.

Trevino's sister, Paula, was the first person Trevino called after the incident. She testified that when the initial phone call came from Trevino, Trevino "was freaking out and sounded like he was scared and panicked." She drove over to the house immediately and found Trevino "crying and shaking." Trevino knelt beside Michelle's body and "was upset and crying." He appeared to be "extremely upset," and he was "pacing." According to Paula, Trevino was "consistently upset and crying."

Some time after Paula arrived at Trevino's house, she called 911. While she admitted that she had previously told the grand jury that she got the call from Trevino before noon and therefore would have been at his house by about 12:20, the 911 call was not made until 12:52. At trial, she testified that she had been mistaken be-

fore the grand jury. She explained that she could not have gotten to Trevino's house that soon because she was with her personal trainer until 11:30 and it takes her 30 minutes to get home from there. She testified that she knew she was watching the news when she got the call from Tommy and the news comes on at noon. The timing was important because the State argued that Paula had delayed in calling 911, implying that she had aided Trevino in staging the crime scene to look like self-defense.

Additionally, Paula had told the 911 operator that Michelle pulled a gun on Trevino and he took it away from her, causing him to accidentally shoot her. But at trial she testified that Trevino had never told her that, that she assumed that that is what had happened because she had seen only one gun.

Trevino's neighbor testified that she was talking on the phone to her boyfriend around noon when she looked out her window and saw three men, including Trevino, in the front yard of Trevino's house. Trevino was pacing. Then a woman arrived and hugged one of the other men. About thirty minutes later the neighbor left her house. When she went outside, there were police cars, an ambulance, and firefighters. The State argued that this testimony showed that Trevino had met with family members to stage the crime scene before calling 911. The neighbor also testified that she had theft-by-check charges pending but the prosecutor had not offered her any deal in exchange for her testimony. Yet she admitted that she was permitted to continue living at home despite there being a warrant for her arrest, and that the prosecutor helped her obtain pre-trial release.

While Paula told the firefighters that she had been there for 15 minutes by the time they had arrived, many of the personnel on the scene testified that it appeared that Michelle had been dead for longer than 15 minutes. Firefighter Stacy Banks testified that when he first arrived on the scene, he thought the shooting had just happened, but he then began to believe that Michelle had "been down for a while." The defense established on cross-examination that the police initially went to the wrong house, and that some of the firefighters walked to the house from their truck parked down the street.

Another firefighter testified that he saw dried blood on Michelle, which made him assume that it had been there for a while. A paramedic testified that when he arrived, he noticed that Michelle had dried blood on her face, indicating to him that she had been dead for a little while. She was ashen gray and cold to touch, and her pupils were large, more evidence that she had been dead for some time. Another firefighter-EMT testified that Paula told him Michelle had been down about 15 minutes by the time he arrived. But he noticed cyanosis, which indicates that the person has been down for more than several minutes.

Detective Kraus testified that he entered the home and saw Trevino kneeling over Michelle. Trevino said "you gotta help her, you gotta help her" and he "sounded distressed."

Max Courtney, the crime scene re-constructionist, testified that the injuries, trajectories, bullet marks, etc., were not consistent with Trevino's story. But he also admitted on cross-examination that nothing about the crime scene or photographs looked staged and that the gun could have fallen the way that it did or could have been kicked out of the way to disarm a person.

The gunshot residue tests from both Trevino and Michelle were inconclusive,

and no fingerprints were identifiable from either weapon. Some witnesses testified that Trevino was calm and unemotional after the shooting, but the defense attempted to portray that as shock. The defense established during its cross-examination of the firearms examiner that the gun could have been fired accidentally.

Dr. Marc Krouse, the medical examiner, testified that he did the autopsy on Michelle. He found three bullet wounds and testified to their entry and exit points, trajectories, and the damage each caused. He said the pelvic wound came first, and the effect of that shot could have ranged from virtual immediate unconsciousness to almost no effect at all. Based on the blood smear on the wall, he felt that after this shot, Michelle had fallen to the floor.

The bullet through the head was the second shot fired and was a fatal wound that would produce death in seconds. He said Michelle could not have struggled after being shot in the head. The shot through her heart was the third shot. She was already dead when this shot hit her. Krouse testified that when this last shot was fired, Michelle's back was up against something. The time between the shots was not long—somewhere between seconds to a minute or two.

Krouse admitted on cross-examination that the first shot was not immediately lethal and that a person could continue to struggle after that shot. He could not rule out the possibility that, after falling, Michelle could have gotten back up again. And he testified that she certainly could have continued to struggle with her upper body. Krouse said the blood at the scene did not indicate that she had been there a long time because these types of injuries will generally cause significant blood loss. He found nothing to indicate whether or not Michelle had struggled.

Trevino presented two defense witnesses. Ted Trevino, Trevino's brother, testified that several years before this incident, he had relayed to Trevino something that Michelle had told him—that she was angry at Trevino for coming home with hickeys on his neck; that while Trevino slept, she had pointed a gun at him; and that she would have shot him except that he had been holding their daughter in his arms while he slept. He admitted that Michelle had told him that Trevino had hit her once in the past, and he testified that he also saw Michelle strike Trevino.

Teresa Trull, Trevino's sister and a police officer, testified that she arrived at the scene and saw Trevino in the patrol car. Trevino "looked shocked." He had "a thousand-yard stare, which, to me, is symptomatic of battle fatigue or post-traumatic stress disorder." He "looked past, beyond me. I was trying to make eye contact with him, but due to the shock, he was looking past me." She also testified that Trevino is not an emotional person and rarely displays emotion.

In the State's rebuttal, Ernest Ramirez, Michelle's uncle, testified that he went to the house the night of the shooting. Tim Trull, Teresa Trull's husband and a police officer, was there with some other people. Ramirez did not think that they should be there. Trull claimed they were getting items for the children, but Ramirez did not see them with any children's items. They had three black trash bags which were full, but Ramirez could not see what was inside them. The lights in the house were off. He helped them clean up the blood on the floor.

In closing arguments, the State argued that Trevino was a controlling and abusive husband, that he hit Michelle and cheated on her, and that Michelle was afraid of him. She finally summoned the courage to leave and on the day of her death had a

job interview. Trevino saw that he was losing control, so he killed her and then staged the crime scene to look like self-defense.

The defense replied that there was no evidence of an abusive relationship or a staged crime scene. They explained that the State wanted the jury to believe it was a staged crime scene "because if it's not staged, it's self-defense."

The jury was charged on both accident and self-defense, but rejected both defenses and found Trevino guilty of murder.

## B. Punishment

At the punishment phase, Trevino requested the judge to instruct the jury pursuant to Penal Code Section 19.02(d). That section provides that if the defendant proves by a preponderance of the evidence that he caused the victim's death while under the immediate influence of sudden passion arising from an adequate cause, the offense is a second-degree felony rather than a first-degree felony. The judge rejected the proposed charge.

The defense presented 15 witnesses testifying that Trevino was a reliable and model employee with no temper, had no prior convictions, was a wonderful and supportive father, and could satisfy the conditions of probation. The State presented two rebuttal witnesses who testified that Trevino was an absentee father and a jealous husband.

The jury sentenced Trevino to 60 years in prison.

## C. Court of Appeals

On appeal, Trevino argued the judge erred in denying him the sudden passion charge and that Trevino had been harmed. The court of appeals agreed.[1] The court acknowledged that an instruction on self-defense does not "automatically obligate" a trial court to instruct on sudden passion, but the court concluded that there was some evidence from which the jury could conclude that Trevino acted in sudden passion and that the trial court erred in failing to give that instruction.[2] The court of appeals also found that Trevino was harmed.[3]

We granted the State's petition for discretionary review to address the appellate court's analysis on error and harm.

## II. Entitlement to Sudden Passion Charge

### A. Legal Background

Before September 1, 1994, the Penal Code defined voluntary manslaughter as causing the death of a person under circumstances that would constitute murder, except that the person acted "under the immediate influence of sudden passion arising from an adequate cause."[4] So at that time, sudden passion was a guilt/innocence issue. This caused some difficulties because the State was forced to disprove sudden passion in any murder prosecution.[5] The Legislature responded to those problems in 1993, deleting voluntary manslaughter from the Code and replacing it

1. *Trevino v. State*, 60 S.W.3d 188 (Tex.App.-Fort Worth 2001).

2. *Id.* at 193–95.

3. *Id.* at 196–97.

4. Penal Code Act of 1973, 63rd Leg., R.S., ch. 399, § 1, sec. 19.04(a), 1973 Tex. Gen. Laws

883, 914, repealed by Penal Code Act of 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3614; *Sanchez v. State*, 23 S.W.3d 30, 34 (Tex.Crim.App.2000).

5. *Moore v. State*, 969 S.W.2d 4, 9 (Tex.Crim. App.1998); *Sanchez*, 23 S.W.3d at 35 (McCormick, P.J., concurring).

with a punishment issue in the murder statute.[6] Now, if a defendant is convicted of murder, he may argue at punishment that he caused the death while under the immediate influence of sudden passion arising from an adequate cause.[7] If he establishes that he did so by a preponderance of the evidence, the offense level is reduced from first degree to second degree and the ensuing punishment range reduced.[8]

When sudden passion was a guilt/innocence issue, we followed the general rule that when evidence from any source raises a defensive issue, and the defendant properly requests a jury charge on that issue, the trial court must submit the issue to the jury.[9] The evidence which raises the issue could be either strong, weak, contradicted, unimpeached, or unbelievable.[10] Since voluntary manslaughter was a lesser-included offense of murder, we applied the standard *Aguilar/Rousseau*[11] rule concerning lesser-included offenses.

But we have not directly addressed whether this same standard applies now that sudden passion is a punishment issue, although some courts of appeals have assumed that it does,[12] and we have said in passing that it should be submitted at the punishment phase of an attempted murder prosecution "if raised by the evidence."[13] Since we are no longer dealing with a lesser-included offense, the *Aguilar/Rousseau* rule does not guide our analysis. Instead, to determine the quantum of evidence necessary to warrant submission of a sudden passion charge at punishment, we look to our caselaw on other punishment issues.

The kidnapping statute provides a punishment issue similar to the sudden passion issue. Under Penal Code Section 20.04(d), the defendant may argue that he voluntarily released the victim in a safe place. If he proves this by a preponderance of the evidence, the offense level is reduced from first degree to second degree. So our caselaw concerning the quantum of evidence necessary to justify submission of a punishment charge on release in a safe place can guide us in this case.

In *Williams v. State*,[14] we held that the accused is entitled to a charge that he released the victim in a safe place if there is "evidence ... admitted supporting a finding that he did." Later, in *Posey v. State*, we recognized that *Williams* was decided under the previous version of Sec-

---

6. *Ex parte Watkins*, 73 S.W.3d 264, 266 n. 2 (Tex.Crim.App.2002); *Sanchez*, 23 S.W.3d at 34.

7. TEX. PENAL CODE § 19.02(d).

8. *Id.*

9. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim.App.1993); *Williams v. State*, 851 S.W.2d 282, 286 (Tex.Crim.App.1993), *overruled on other grounds, Posey v. State*, 966 S.W.2d 57 (Tex.Crim.App.1998); *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Crim.App. 1978).

10. *Muniz*, 851 S.W.2d at 254. *See also Dickey v. State*, 22 S.W.3d 490, 496 n. 3 (Tex.Crim. App.1999); *Frank v. State*, 688 S.W.2d 863,

868 (Tex.Crim.App.1985); *Booth v. State*, 679 S.W.2d 498, 500 (Tex.Crim.App.1984).

11. *See Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Crim.App.1985); *Rousseau v. State*, 855 S.W.2d 666, 672 673 (Tex.Crim.App.1993).

12. *Williams v. State*, 35 S.W.3d 783, 787 (Tex. App.-Beaumont 2001, pet. ref'd); *Saldivar v. State*, 980 S.W.2d 475, 505 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd); *Perez v. State*, 940 S.W.2d 820, 822 (Tex.App.-Waco 1997, no pet.).

13. *Mims v. State*, 3 S.W.3d 923, 928 (Tex. Crim.App.1999).

14. 851 S.W.2d at 286.

tion 20.04 and that, to the extent that it required the court to give the charge even in the absence of a request from the defendant, it had essentially been overruled by the Legislature's amendment to Section 20.04.[15] But assuming the defendant requests the charge, we did not dispute *Williams*'s conclusion that the charge should be given if the "evidence raises the issue."[16]

Similarly, Penal Code Section 8.04 provides that evidence of temporary insanity caused by intoxication may be introduced in mitigation of punishment. We have stated that a jury charge pursuant to Section 8.04, like the one pursuant to Section 20.04, should be given if it is raised by the evidence,[17] indicating that "some" evidence is sufficient.

■ Given the caselaw regarding these statutes, as well as our statement in *Mims* that the sudden passion charge should be given if it is raised by the evidence, we conclude that the previous standard concerning whether a sudden passion should be given at guilt/innocence equally applies now that it is a punishment issue. That is, a sudden passion charge should be given if there is some evidence to support it, even if that evidence is weak, impeached, contradicted, or unbelievable.

Finally, we note that there is no requirement that evidence admitted at guilt/innocence be re-offered to be considered at punishment.[18] Indeed, evidence on a punishment issue "will often come out in the course of the State's own evidence of the circumstances of the offense itself, at the guilt phase of trial."[19]

## B. Application

The State makes three basic arguments as to why Trevino was not entitled to a sudden passion charge in this case. We will address each argument in turn.

### 1. Weak and Impeached

■ The State first argues that "there was no evidence from which a jury could have rationally inferred that [Trevino] . . . acted in sudden passion." In support of this argument, the State points out evidence from the record that (1) Trevino destroyed the telephone numbers during the argument with Michelle, indicating that his mind was indeed capable of cool reflection; (2) Trevino "effectively" admitted to Detective Boetcher that he armed himself before going into the bathroom, and he did not state that he armed himself because he feared Michelle; (3) Trevino and Paula both told Detective Boetcher that Trevino "managed" to shoot Michelle, implying that it was an accident, and there can be no sudden passion if a shooting is accidental; and (4) Trevino never expressed remorse to Detective Boetcher, which "would certainly be expected" from someone who acted in sudden passion. The State contends that Trevino himself "apparently never felt any such passion arise and the record shows only calculation and reflection on his part."

The problem with the State's argument is that it addresses solely the evidence against sudden passion. While the evidence the State mentions was presented at

---

**15.** 966 S.W.2d at 63.

**16.** *Id.* at 62–63.

**17.** *Martinez v. State,* 17 S.W.3d 677, 691 n. 14 (Tex.Crim.App.2000); *Williams v. State,* 937 S.W.2d 479, 490 n. 10 (Tex.Crim.App.1996).

**18.** *Buchanan v. State,* 911 S.W.2d 11, 13 (Tex.Crim.App.1995); *Ex parte Kunkle,* 852 S.W.2d 499, 502 (Tex.Crim.App.1993); *Wright v. State,* 468 S.W.2d 422, 425 (Tex.Crim.App. 1971).

**19.** *See Williams,* 851 S.W.2d at 286 n. 2.

trial, an appellate court's duty is to look at the evidence supporting that charge, not on the evidence refuting it.[20] The evidence that supports the sudden passion instruction in this case consists of the following:

- Detective Boetcher testified that Trevino told him that there had been a verbal altercation between him and Michelle; that Michelle was angry because she found some phone numbers in his wallet of some other girls; that Trevino was in the living room when Michelle confronted him with a .38 pistol, pointed it at Trevino, and pulled the trigger twice; that Trevino was scared, but the gun did not fire, so he figured the gun was not loaded; that Trevino went to the bathroom and at some point got his 9 millimeter gun; that Michelle shot at Trevino in the bathroom; that the two then struggled over the guns; that Michelle got shot; that the struggle continued; and that Michelle was eventually shot three times.

- Paula testified that when the initial phone call came from Trevino, after the shooting, Trevino "was freaking out and sounded like he was scared and panicked." She drove over to the house immediately and found Trevino "crying and shaking." Trevino knelt beside Michelle's body and "was upset and crying." He appeared to be "extremely upset," and he was "pacing." According to Paula, Trevino was "consistently upset and crying."

- Detective Kraus testified that he entered the home and saw Trevino kneeling over Michelle. Trevino said, "You gotta help her, you gotta help her." He "sounded distressed."

- Teresa Trull, Trevino's sister and a police officer, testified that she arrived at scene and saw Trevino in the patrol car. Trevino "looked shocked." He had "a thousand-yard stare, which, to me, is symptomatic of battle fatigue or post-traumatic stress disorder." He "looked past, beyond me. I was trying to make eye contact with him, but due to the shock, he was looking past me."

This evidence may be weak and it arguably was impeached by the State's evidence. But a defendant is entitled to the sudden passion charge even if the evidence is weak and even if it is contradicted by the State's evidence. This evidence constitutes "some" evidence that Trevino acted in sudden passion.[21]

### 2. Accident

■ The State also argues that this evidence does not support a sudden passion charge because it indicates that Trevino acted accidentally, and if he acted accidentally he could not possibly have acted in sudden passion. We see two flaws in this argument.

First, we note that the State misinterprets the evidence. While there was some minimal mention of accident, and the jury was charged on accident, Trevino's primary defense was self-defense. In closing arguments, defense counsel only argued that Trevino acted in self-defense, not that he acted accidentally. Indeed, at times the defense specifically contested the accident theory at trial, such as when Paula retracted her previous comments to the 911 operator that the shooting had been an accident.

---

20. See *Sanchez v. State*, 745 S.W.2d 353, 357 (Tex.Crim.App.1988).

21. See *Moore*, 969 S.W.2d at 15 (Keller, J., concurring & dissenting) (some examples of evidence which can raise the sudden passion issue are "running, striking inanimate objects without any apparent rational purpose, shouting, screaming, crying, and facial expressions").

The State relies on the fact that Trevino told both Paula and Detective Boetcher that he "managed" to shoot Michelle, which according to the State, implies that Trevino shot her accidentally. While that is one possible interpretation of the comment, another is that Trevino "managed" to prevent Michelle from killing him and instead shot her in self-defense.

But regardless of the extent to which Trevino argued accident, the State's argument must fail because evidence of accident does not prevent Trevino from receiving a charge on sudden passion at punishment. In *Schoelman v. State*,[22] we held the trial court erred in denying the defendant's voluntary manslaughter charge even though the defendant had argued and received a charge on accident. We reasoned that the sudden passion charge should be given when it is raised by the evidence, even if it "conflicts with other evidence in the case."[23] Although that case was decided when sudden passion was a guilt/innocence issue rather than a punishment issue, we have concluded that the same quantum of evidence is required for punishment issues. So Trevino was entitled to the sudden passion charge at punishment because there was some evidence supporting that charge, regardless of whether it conflicted with other evidence, including some evidence of an accidental shooting.

The State cites *Moore v. State*,[24] *Davila v. State*,[25] and *Corral v. State*[26] as support for its position. Neither *Moore* nor *Corral* concerned issues of accident, so they are not helpful in the resolution of this issue. *Davila* does support the State, and *Davila* relies on *Owens v. State*.[27] In both cases, courts of appeals held when a defendant denies specific intent to kill, that testimony alone negates an essential element of the offense of voluntary manslaughter, so no charge should be given.

We disagree that these cases control the outcome of today's case. These cases were decided when sudden passion was a guilt/innocence issue that transformed murder into voluntary manslaughter. The courts reasoned that "[b]y denying specific intent to kill, appellant negated the essential element of intent necessary to the offense of voluntary manslaughter."[28] But with sudden passion as a punishment issue, the defendant's intent to kill has already been affirmatively resolved by the jury and is no longer relevant. Since the defendant killed intentionally, the issue at punishment is whether he did so in sudden passion. So any claim of accident at guilt/innocence would not preclude the submission of sudden passion at punishment.

### 3. Aberrational Nature of Response

Finally, the State argues that Trevino was not entitled to a sudden passion charge because of "the aberrational nature of his response to the alleged provocation." The State contends that Trevino's "re-

**22.** 644 S.W.2d 727, 732–33 (Tex.Crim.App. 1983).

**23.** *Id.* at 732. *See also Steen v. State*, 88 Tex.Cr.R. 256, 225 S.W. 529, 531 (1920) (op. on reh'g).

**24.** 969 S.W.2d at 11.

**25.** 952 S.W.2d 872, 877 (Tex.App.-Corpus Christi 1997, pet. ref'd).

**26.** 900 S.W.2d 914, 919 (Tex.App.-El Paso 1995, no pet.).

**27.** 786 S.W.2d 805 (Tex.App.-Fort Worth 1990, pet. ref'd).

**28.** *Davila*, 952 S.W.2d at 877; *Owens*, 786 S.W.2d at 808. *See also Aquino v. State*, 710 S.W.2d 747, 751 (Tex.App.-Houston [14th Dist.] 1986, pet. ref'd).

sponse to Michelle's alleged shooting is not something society would recognize as normal or justified based on the undisputed physical evidence, which showed that the wounds to Michelle had not been inflicted simultaneously."

Again, the State errs in addressing only the evidence against sudden passion. Although the evidence reflected that the wounds were not inflicted simultaneously, there was also evidence that they could have been inflicted within seconds of each other. If the jury had believed that the shots occurred in rapid succession during a heated struggle, then Trevino's actions would not have been "aberrational."

### 4. Appellate Court's Error

■ Although we are not persuaded by the State's arguments, we do find some flaws in the appellate court's analysis. The court of appeals stated that Trevino's "shooting Michelle three times in response to Michelle's provocation in firing her own gun at [him] was an action from which the jury could conclude that [Trevino] was acting under the immediate influence of sudden passion at the time of the killing." [29] We disagree. The mere fact that a defendant acts in response to the provocation of another is not sufficient to warrant a charge on sudden passion. Instead, there must be some evidence that the defendant was under the immediate influence of sudden passion. And, as we have explained, some such evidence existed in this case.

On these facts Trevino was entitled to an instruction on sudden passion. The court of appeals correctly concluded that

the trial judge erred by denying him the instruction.

### III. Harm

■ The State also argues that the court of appeals erred in its harm analysis. We think the court of appeals reached the right result, for the following reasons.

Although the appellate court indicated that it was Trevino's burden to show harm,[30] we have recently recognized that burdens of proof have little meaning in a harm analysis.[31] Instead, the appellate court should make its own assessment as to whether harm occurred.[32]

In concluding that Trevino suffered some harm, the court of appeals stated, "Having determined that there was some evidence to warrant submission to the jury of the mitigating circumstance of sudden passion, we cannot conclude that the trial court's refusal to submit such an instruction upon [Trevino's] proper request was harmless." [33] In other words, according to the court of appeals, the mere fact that Trevino should have received the charge necessarily means that he was harmed by the failure to get it. This statement is essentially a conclusion that harm results per se, an approach that we have rejected. We have made clear that "[e]xcept for certain federal constitutional errors labeled by the United States Supreme Court as structural, no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis." [34] Jury charge error is not structur-

29. *Trevino,* 60 S.W.3d at 195.

30. *Trevino,* 60 S.W.3d at 196.

31. *Ovalle v. State,* 13 S.W.3d 774, 787 (Tex. Crim.App.2000).

32. *Id.*

33. *Trevino,* 60 S.W.3d at 197.

34. *Cain v. State,* 947 S.W.2d 262, 264 (Tex. Crim.App.1997).

al error and therefore must be reviewed for harm.[35]

The standards for appellate review of error in the court's charge are set in Article 36.19 of the Code of Criminal Procedure.[36] We have held that, when a defendant properly objected to the charge, the applicable statutory standard is whether "the error appearing from the record was calculated to injure the rights of the defendant," [37] or in other words, whether there was "some harm." [38]

The State argued below that the jury's rejection of Trevino's defense of self-defense demonstrated that he was not harmed by the lack of a sudden passion charge. The appellate court rejected this argument, concluding that the fact that the jury rejects a defendant's defense of self-defense "does not automatically deprive him of the right to an instruction at the punishment phase" [39] on sudden passion. Although this statement literally refers to whether there was error (whether such a defendant would have a "right" to a charge on sudden passion), its reasoning also applies to the question of harm (whether the failure to charge on sudden passion harmed such a defendant).

As the State points out, this particular case involved two competing theories at guilt/innocence. The State argued that

Trevino shot Michelle in cold blood and staged the crime scene afterwards to make it look like self-defense, while the defense argued that Trevino and Michelle struggled and he shot her in self-defense. As the defense argued during closing, if the jury were to find that the crime scene was staged, it would conclude that Trevino did not act in self-defense. On the other hand, if the jury were to conclude that the crime scene was not staged, it would find that he did act in self-defense. As good as this reasoning may be on the issue of self-defense, the issue before us is the failure to instruct on sudden passion. The evidence in a case in which a jury rejected a claim of self-defense could demonstrate also that the defendant was not harmed by the failure to receive a sudden passion charge,[40] but the evidence in another such case might not demonstrate a lack of harm.

In this case the evidence of "staging" does not demonstrate that the jury could not have found sudden passion. The defendant may have indeed killed the victim in sudden passion (a second-degree murder) and then staged the crime scene in an attempt to make it appear that the killing occurred in self-defense (a justifiable homicide). The jury was entitled to consider this scenario. Therefore, the jury's rejec-

---

**35.** *Payne v. State,* 11 S.W.3d 231, 232 (Tex. Crim.App.2000).

**36.** "Review of charge on appeal.
"Whenever it appears by the record in any criminal case that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of trial." Tex.Code Crim. Proc. art. 36.19

**37.** Id.

**38.** *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g).

**39.** *Trevino,* 60 S.W.3d at 196.

**40.** *See Chavez v. State,* 6 S.W.3d 56, 65 (Tex. App.San Antonio 1999, pet. ref'd) (stating that except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion).

tion of self-defense at guilt-innocence does not necessarily mean that, given an instruction on sudden passion at punishment, it would have rejected that theory as well. In this case, we cannot say with "fair assurance" that the error did not have an "injurious effect or influence in determining the jury's verdict."[41] We cannot conclude that had it received an instruction on sudden passion, the jury would not have made an affirmative finding on the issue.

We conclude, therefore, that the omission of the instruction resulted in some harm to the appellant and constitutes reversible error.

### IV. Conclusion

We affirm the Court of Appeals' judgment, which reversed the trial court's judgment as to punishment and remanded the case to the trial court to conduct a new punishment hearing.

KEASLER, J., filed a concurring and dissenting opinion.

KEASLER, J., delivered this concurring and dissenting opinion.

I join sections I and II of the Court's opinion but dissent to sections III and IV. I believe the error in the charge was harmless.

The State's argument is persuasive. While it will not always be the case that evidence of self-defense renders harmless the failure to give a sudden passion charge at punishment, it is also true that a jury's rejection of self-defense could, in a particular case, demonstrate that the defendant was not harmed by the failure to receive a

sudden passion charge.[1] As the majority recognizes, this case involved two competing theories at guilt-innocence. The State argued that Trevino shot Michelle in cold blood and staged the crime scene afterwards to make it look like self-defense. The defense, on the other hand, argued that Trevino and Michelle struggled and that Trevino shot Michelle in self-defense. Indeed, the defense made clear during closing argument that if the jury were to find that the crime scene was staged, it would have to conclude that Trevino did not act in self-defense. On the other hand, if the jury were to conclude that the crime scene was not staged, it would have to find that he did act in self-defense. Under all the specific facts of this case, the jury's rejection of self-defense at guilt-innocence necessarily constituted a rejection of sudden passion. As a result, I cannot believe that Trevino suffered any harm whatsoever in the denial of the charge.

I would reverse the judgment of the Court of Appeals and reinstate the trial court's judgment of conviction.

---

41. *See King v. State*, 953 S.W.2d 266, 271 (Tex.Cr.App.1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945)).

1. *See Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.San Antonio 1999, pet. ref'd) (stating that except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion).