COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

)
JOE ALBERT RAMON, SR.,                             )                  No. 08-03-00045-CR
)
                                    Appellant,                        )                             Appeal from
)
v.                                                                          )                  161st District Court
)
THE STATE OF TEXAS,                                   )                  of Ector County, Texas
)
                                    Appellee.                          )                  (TC# B-29,686)

O P I N I O N

            Joe Albert Ramon was indicted for the murder of his wife, Estella Ramon. Appellant
admitted guilt and the jury sentenced him to ninety-nine years in the Texas Department of Criminal
Justice. Finding no error, we affirm.
FACTUAL SUMMARY
            Appellant and his wife separated during the summer of 1999. Estella purportedly moved out
because their daughters hated Appellant and wanted their mother to divorce him. Nevertheless, the
couple continued to see each other until events escalated in January 2002. On January 14, Appellant
tried to see Estella, but she was tired that evening. They made plans to see each other the next day
so that Appellant could see his grandson. Appellant was to meet Estella at her home, but she drove
off as he arrived. He followed her to the Christian broadcasting warehouse. When he arrived, he
spotted Estella’s car and headed for the building. His daughter, Clarinda, jumped out of Estella’s
car and ran for her mother. When Appellant walked into the building, he saw Estella talking to
Fernando Carrillo. Appellant had caught Estella staying at Carrillo’s apartment a year before and
believed they were having an affair. But he thought that Carrillo had moved away and was shocked
to learn otherwise. Appellant told Estella he needed to talk to her and asked her to come outside. 
Carrillo told him Estella was not going anywhere. Appellant lost his temper and started hitting
Carrillo. Clarinda broke up the fight. She remembered Appellant saying he was going to get his
gun. Someone at the warehouse called the sheriff’s office, and Estella and Clarinda were later taken
to a shelter.
            Appellant described himself as emotionally hurt and confused after the incident and he
wondered what was going on between Carrillo and Estella. Later that evening, Appellant and his
son went out together to look for Estella. Joe Jr. testified that Appellant wanted to ask Estella why
she was with Fernando that night. Joe described his father as sad, depressed, and wanting to cry. 
They looked for her until 6 a.m. but did not find her, and Appellant called in sick to work the next
day. On Wednesday, Appellant went out looking for his wife again. That evening, he and his son
cruised through parking lots of apartment complexes since Appellant was convinced that Estella was
with Carrillo. Appellant was frustrated because he wanted to confront Estella. That night, Appellant
again did not get any sleep. He went to work on Thursday but passed by Estella’s trailer at lunch. 
He saw Clarinda at the trailer and asked her where her mother was. He told her he would kill Estella
and Fernando if he found them together. Once Appellant left, he kept calling the house and later
knocked on the door. When she did not open the door, Appellant threatened to kill both Clarinda
and Estella. 
            Appellant again started searching for his wife around seven that evening. He went to work
on Friday, finishing his route around 1 p.m. After work, he drove by his other job to pick up his
paycheck and then went home. From his cellular phone, he called Estella at work and told her he
needed to know whether she had something going on with Carrillo. Estella hung up on him. 
Appellant then surmised that Estella had spent all those days with Carrillo. When he called back,
Estella’s boss got on the phone and told Appellant not to call or visit Estella at work. Appellant
hung up. The next thing he recalled was standing outside Lou’s Lab where Estella worked with a
gun in his hand. He admitted that he shot and killed Estella, and that he shot and injured an officer. 
            Co-worker Erica Dominguez put the week’s events in perspective from Estella’s point of
view. Erica testified that she had not gone into work on Monday because she was sick, but that
Estella had called her that evening. Estella was upset, depressed, and suicidal. Estella went into
work on Tuesday but not on Wednesday. When she arrived on Thursday, Estella hid in the back lab
so that if Appellant or her son came in, they would think that she was not at work. Estella had been
staying at Safe Place, and Stephen Lindemann, Lou’s Lab manager, was taking her to and from work. 
Lou Lindemann, Stephen’s father, was the owner of the lab.
            Erica remembered Appellant calling for Estella at 2:27 p.m. that day. Estella took the call
and mouthed to Erica that it was Appellant and signaled for her to come listen. Appellant wanted
to see Estella and told her she could not hide from him forever. He agreed to allow their son to
attend the meeting so she would feel safe. Appellant then commented that he had his lawyer ready,
the bond ready, and was pleading insanity. Estella was upset and hung up the phone. Appellant
called back, but Estella refused the call. Erica called Stephen on the intercom and explained the
previous call and then transferred the call to Stephen’s office. 
            Stephen was familiar with Appellant since there had been previous incidents of harassment. 
He was also aware of the escalating problems between the couple. Stephen had tried to
accommodate Estella by volunteering to bring her to and from work, allowing her different work
shifts, giving her freedom to meet with counselors and the sheriff’s office, and providing
concealment in a back lab during her work. When he took the call on that fateful day, Stephen tried
to be calm. But Appellant told him he would kill both him and Estella. When Stephen told him to
calm down, Appellant hung up.
            Stephen then called the police, and Officer Greg Travland was dispatched to the scene. Erica
escorted the officer back to Stephen’s office. First, the officer spoke with Stephen and Lou about
the harassment and threats. Later, Estella was called back to the office, and the officer took down
information from her about the incident. Both Stephen and Estella made a complaint. Estella then
returned to her desk.
            Paul Guerrero saw Appellant enter through the back door of the lab. Appellant nodded his
head at Paul and entered casually, like a “normal” person. He took a quick peek into the back office
where the Linnemans and Officer Greg Travland were sitting. Paul noticed a gun in Appellant’s
hand. He did not believe that the officer saw Appellant, so he said, “There he is. He’s got a gun.” 
At that time, Anthony Flores came out of the lab and saw the gun. Appellant began running toward
the front of the office, and both Paul and Anthony heard gunshots. They ran out the back door. The
officer then heard four rapid fire shots in the front reception area.
            Flor Rios was sitting in the waiting room when she saw Appellant walking slow and
scrunching down as he came down the hall and into the receptionist room. Clarinda’s back was
facing Appellant when he walked into the office and when she turned around, she saw the gun. Erica
became aware that Appellant was in the office when she heard yelling. Erica saw that he had a gun
and that Appellant had Estella by her hair against the filing cabinet. Estella was telling Appellant
“no” and “please stop,” and Clarinda was yelling. Clarinda remembered Appellant saying, “Yes,
yes” in Spanish to Estella. Appellant shot Estella three or four times but she got away. When he
shot her in the back, she slammed into the filing cabinet, and fell.
            Flor watched as Appellant pointed the gun at Erica and then shot at her. Erica jumped over
the counter over the desk area landing face first on the floor and ran out of the door. She heard more
gunshots as she ran out. Flor ran out behind her.
            Appellant left the receptionist area and moved into the hall. Clarinda heard gunshots. 
Stephen described a shoot-out between Appellant and Officer Travland. The officer was shot in the
upper thigh. He then exited the building and moved to a steel storage building outside. 
            Appellant re-entered the back office and pointed the gun at Stephen. Stephen scrambled
under his desk but could still see Appellant’s feet from underneath and heard two clicks from the
gun. Suddenly Appellant was behind him; he heard bullets or shells hitting the floor and Stephen
thought Appellant was reloading.
            Officer Travland saw Appellant exit the building and heard him say, “Officer, officer, where
are you? I’m going to give up.” In fact, Appellant was reloading his gun. When the officer’s radio
crackled, Appellant turned around, smiled, and said, “Now I have you.” But Travland fired and
Appellant fell to the ground.
PROCEDURAL SUMMARY
            In response to Appellant’s requests, the State provided two letters detailing the extraneous
offenses it planned to use against Appellant during both the guilt/innocence and punishment phases
of trial. In the first letter, the State disclosed three incidents involving Appellant and his wife: (1)
an assault and threats occurring on January 15, 2002; (2) an assault and threats occurring on
January 16, 2002; and (3) an assault and threats occurring on January 17, 2002. The second letter
detailed one incident between Appellant and the victim--kidnapping and threats occurring on
November 20, 1999.
            At trial on rebuttal, the State called Cassandra Ramon to the stand. Cassandra is another
daughter of the couple. She testified that her father often threatened her mother. She offered two
examples: “If your momma ever tries to leave me, I will kill her and anyone that stands in my way,”
and “The only way that your mom will ever leave me is if she goes in a hearse or an ambulance.” 
Later in her testimony, Cassandra was asked whether she knew of any specific instances of her
mother being in danger from Appellant since her brother had testified that he did not believe she ever
was. Cassandra first described an incident when Appellant pointed a gun at Estella because he did
not like the way she had prepared the chicken fried steak. On another occasion, Appellant threw a
plate at Estella because she did not make him a drink. Estella ducked and the plate hit the wall and
broke. Finally, Cassandra described the time Estella wrecked the family car. Appellant shoved the
children into a bedroom, grabbed Estella by the hair, started running with her, and tried to shove her
head through a window. When asked why her mother did not divorce Appellant, Cassandra cried
and quoted her mother as saying that Appellant would kill her as soon as she divorced him.
INEFFECTIVE ASSISTANCE OF COUNSEL
            In Points of Error One and Two, Appellant complains that his trial counsel failed to object
to the admission of extraneous offenses committed against the victim. In Point of Error One, he
specifically contends that the extraneous offenses were improper rebuttal evidence, had no relevance
beyond character conformity, and were introduced solely to circumvent notice requirements. He also
argues that the State did not notify him of its intention to use these incidents as punishment evidence. 
In Point of Error Two, Appellant argues that counsel should have objected under Rule 403 because
Cassandra’s testimony did not make a fact of consequence more or less probable, had the potential
to influence the jury in an irrational and indelible way, and could not be readily dismissed by the
jury. He concludes that the failure to object could not have been trial strategy and that it is
reasonable to believe that the admission of the evidence changed the outcome of the proceeding to
his detriment.
Standard of Review
            The proper standard for determining claims of ineffective assistance under the Sixth
Amendment is the two-step analysis adopted by the United States Supreme Court in Strickland v.
Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Hernandez v. State, 988
S.W.2d 770, 771-72 (Tex.Crim.App. 1999). Under the first prong, the defendant must show that
counsel’s performance was deficient, to the extent that counsel failed to function as the “counsel”
guaranteed by the Sixth Amendment. Jackson v. State, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).
The defendant must demonstrate that his attorney’s representation fell below an objective standard
of reasonableness under prevailing professional norms. Vasquez v. State, 830 S.W.2d 948, 949
(Tex.Crim.App. 1992). Under the second prong, the defendant must establish that counsel’s
deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80
L.Ed.2d at 693; Jackson, 877 S.W.2d at 771. Prejudice is established by a showing that there is a
reasonable probability that but for counsel’s unprofessional errors, the result of the proceeding would
have been different. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; Jackson, 877
S.W.2d at 771; Hernandez v. State, 726 S.W.2d 53, 55 (Tex.Crim.App. 1986). A reasonable
probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; Jackson, 877 S.W.2d at 771.
            When we review a claim of ineffective assistance of trial counsel, we must indulge a strong
presumption that counsel’s conduct falls within the wide range of reasonable, professional
assistance, and the appellant must overcome the presumption that the challenged conduct can be
considered sound trial strategy. Jackson, 877 S.W.2d at 771; Calderon v. State, 950 S.W.2d 121,
126 (Tex.App.--El Paso 1997, no pet.). An appellant challenging trial counsel’s performance
therefore faces a difficult burden and “a substantial risk of failure.” See Thompson v. State, 9
S.W.3d 808, 813 (Tex.Crim.App. 1999). Allegations of ineffectiveness of counsel must be firmly
founded in the record. Hawkins v. State, 660 S.W.2d 65, 75 (Tex.Crim.App. 1983), cert. denied,
Hawkins v. Collins, 506 U.S. 1089, 113 S.Ct. 1147, 122 L.Ed.2d 498 (1993); Calderon, 950 S.W.2d
at 126. Under the Strickland test, the Appellant bears the burden of proving ineffective assistance
by a preponderance of the evidence. Jackson, 877 S.W.2d at 771; Calderon, 950 S.W.2d at 126.
Extraneous Offenses
            An accused may not be tried for some collateral crime or for being a criminal generally. 
Tex.R.Evid. 404(b). In the face of a proper objection, evidence of other wrongful acts is not
admissible to prove the character of the person to establish that he acted accordingly regarding the
alleged offense. Montgomery v. State, 810 S.W.2d 372, 386 (Tex.Crim.App. 1990); Lazcano v.
State, 836 S.W.2d 654, 657 (Tex.App.--El Paso 1992, pet. ref’d). An extraneous offense may be
admissible if it has relevance apart from its tendency to prove the character of a person in order to
show that he acted in conformity therewith. Montgomery, 810 S.W.2d at 387; Lazcano, 836 S.W.2d
at 657. Evidence which logically serves such purposes as “proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident” is relevant beyond its
tendency to prove conforming character. Montgomery, 810 S.W.2d at 387; Lazcano, 836 S.W.2d
at 657; Tex.R.Evid. 404(b). Extraneous offenses are also admissible to rebut a defensive theory. 
Crank v. State, 761 S.W.2d 328, 341 (Tex.Crim.App. 1988), overruled on other grounds, Alford v.
State, 866 S.W.2d 619, 624 n.8 (Tex.Crim.App. 1993); Yohey v. State, 801 S.W.2d 232, 236
(Tex.App.--San Antonio 1990, pet. ref’d). In addition, “evidence may be offered by the state and
the defendant as to any matter the court deems relevant to sentencing, including but not limited to
the prior criminal record of the defendant, his general reputation, his character, an opinion regarding
his character, the circumstances of the offense for which he is being tried, and, notwithstanding
Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act
that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or
for which he could be held criminally responsible, regardless of whether he has previously been
charged with or finally convicted of the crime or act.” Tex.Code Crim.Proc.Ann. art. 37.07,
§ 3(a)(1)(Vernon Pamph. 2004-05). Section 3(g) provides that “[o]n timely request of the defendant,
notice of intent to introduce evidence under this article shall be given in the same manner required
by Rule 404(b), Texas Rules of Criminal Evidence.” Tex.Code Crim.Proc.Ann. art. 37.07, § 3(g). 
Finally, in a murder prosecution, evidence relating to the previous relationship between the defendant
and the deceased is admissible, as is evidence relating to the condition of the defendant’s mind at
the time of the offense. Tex.Code Crim.Proc.Ann. art. 38.36(a)(Vernon Pamph. 2004-05). 
Although relevant, evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations
of undue delay, or needless presentation of cumulative evidence. Tex.R.Evid. 403.
            In Jaubert v. State, 74 S.W.3d 1, 2-3 (Tex.Crim.App.), cert. denied, 537 U.S. 1005, 123 S.Ct.
495, 154 L.Ed.2d 403 (2002), the court examined the notice provision within Article 37.07. Under
the plain language of the statute, Section 3(g) incorporates by reference Rule 404(b)’s manner of
giving notice. Id. at 2. Rule 404(b)provides that certain evidence is admissible if “upon timely
request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to
introduce in the State’s case-in-chief such evidence. . . .” Id. The court concluded that since the
notice requirement of Rule 404(b) encompasses only case-in-chief evidence, the requirements of 
Section 3(g) likewise appear to encompass only case-in-chief evidence. Id. at 3.
Analysis
            First, the incidents at issue here were admissible under Article 38.36(a) to show the previous
relationship between Appellant and Estella. Under Article 37.07, they were also relevant to
sentencing. See Tex.Code Crim.Proc.Ann. art. 37.07, § 3(a)(1); art. 38.36. Secondly, the
extraneous acts were proper rebuttal evidence since Appellant’s son had testified that Estella had no
reason to fear Appellant. Finally, as a part of establishing his ineffective assistance claim, Appellant
had to show that he was entitled to notice of the extraneous offenses introduced at trial in order to
show counsel was deficient. Here, the extraneous offenses were admitted during rebuttal, not during
its case-in-chief. Because Appellant was not entitled to notice, he cannot demonstrate that counsel’s
failure to object constituted ineffective assistance. See Jaubert, 74 S.W.3d at 3. 
            While we agree that counsel could have objected to the extraneous offenses on Rule 403
grounds, in light of admissibility under Articles 37.07 and 38.36, any objection would likely have
been to no avail. See Tex.Code Crim.Proc.Ann. art. 37.07, § 3(a)(1); art. 38.36. The decision to
object to evidence that is admissible by statute is a matter of trial strategy. See Calderon, 950
S.W.2d at 129. When the record reflects little more than the fact that evidence was admitted without
objection, it is difficult to determine whether counsel acted in an ineffective manner. Calderon, 950
S.W.2d at 126. Counsel may well have had a good reason for not objecting to the evidence. See id. 
Viewing the entire record, we cannot say that counsel’s failure to object rises to the level of
ineffective assistance. Points of Error One and Two are overruled.
CHARGE ERROR
            In Point of Error Three, Appellant complains that the trial court erred in denying his request
for a special charge on sudden passion. He argues that his wife’s refusal to speak with him caused
him to snap in the short time frame of approximately ten minutes. He claims that he was so
distraught, he could not even remember entering the lab or killing his wife. Appellant contends that
his emotional state was brought on by his wife’s conduct immediately before the murder.
            At the punishment stage, the defendant may raise the issue of whether he caused the death
under the immediate influence of sudden passion arising from an adequate cause. Tex.Pen.Code
Ann. § 19.02(d)(Vernon 2003). Sudden passion is defined by statute as a “passion directly caused
by and arising out of provocation by the individual killed or another acting with the person killed
which passion arises at the time of the offense and is not solely the result of former provocation.” 
Tex.Pen.Code Ann. § 19.02(a)(2). Adequate cause is defined as “cause that would commonly
produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to
render the mind incapable of cool reflection.” Tex.Pen.Code Ann. § 19.02(a)(1).
            A sudden passion charge should be given if there is some evidence showing that the
defendant’s mental state “rose beyond a bare claim of fear or was so strong and overpowering that
it rendered him incapable of rational thought and collected action.” Jones v. State, 963 S.W.2d 177,
180 (Tex.App.--Fort Worth 1998, pet. ref’d). A sudden passion charge should be given if there is
some evidence to support it, even if that evidence is weak, impeached, contradicted, or unbelievable. 
Trevino v. State, 100 S.W.3d 232, 238 (Tex.Crim.App. 2003). We must therefore consider all of the
evidence raised at trial, regardless of the strength of the evidence or whether it is controverted. Reese
v. State, 877 S.W.2d 328, 333 (Tex.Crim.App. 1994). 
            The evidence may not be so weak, contested, or incredible that it could not support a finding
by a rational jury. See Moore v. State, 969 S.W.2d 4, 11 (Tex.Crim.App. 1998); Benavides v. State,
992 S.W.2d 511, 526 (Tex.App.--Houston [1st Dist.] 1999, pet. ref’d). “The mere fact that a
defendant acts in response to the provocation of another is not sufficient to warrant a charge on
sudden passion. Instead, there must be some evidence that the defendant was under the immediate
influence of sudden passion.” Trevino, 100 S.W.3d at 241. Testimony that the defendant became
enraged, resentful, or terrified immediately before the shooting adequately indicates such a state of
mind. Havard v. State, 800 S.W.2d 195, 217 (Tex.Crim.App. 1989)(op. on reh’g)(holding
appellant's testimony he was “emotionally hurt and mad at the time he raised his rifle” and feared
for his life when he “saw two men with weapons drawn coming toward him” was sufficient to
require sudden passion instruction). But anger alone is generally not considered sufficient to find
that Appellant acted under the influence of sudden passion. See Gutierrez v. State, 85 S.W.3d 446,
451 (Tex.App.--Austin 2002, pet. ref’d)(noting that “anger does not rise to the level of adequate
cause”). Sudden passion must arise at the time of the offense and cannot result solely from former
provocation. Hernandez v. State, 127 S.W.3d 206, 213 (Tex.App.--Houston [1st Dist.] 2003, pet.
ref’d). Provocation by people other than the victim or one acting with her does not meet the
definition of sudden passion. Id.
Standard of Review
            We review evidence offered in support of a defensive issue in the light most favorable to the
defense. Benavides, 992 S.W.2d at 525. The trial court must submit an instruction on sudden
passion if there is some evidence of (1) a legally adequate cause that would produce anger, rage,
resentment, or terror sufficient to render an ordinary person incapable of cool reflection, and (2) the
accused’s excited and agitated state of mind arising out of provocation by the victim or someone
acting with the victim at the time of the killing. Id. at 526.
Analysis
            Sudden passion must be caused by and arise out of provocation. See Tex.Pen.Code Ann.
§ 19.02(a)(2). Estella simply chose not to speak to Appellant when he called her office, and her
manager merely asked Appellant not to call or come by the office due to the disruption it caused. 
Estella in no way provoked Appellant. See Hernandez, 127 S.W.3d at 213. Second, sudden passion
must arise from an adequate cause. See Tex.Pen.Code Ann. 19.02(d). While Appellant argues that
his wife’s actions resulted in his sudden passion, Estella’s refusal to speak to or see Appellant would
not produce such a degree of anger, rage, or resentment in a person of ordinary temper sufficient to
render Appellant’s mind incapable of cool reflection. See Tex.Pen.Code Ann. § 19.02(a)(1). Third,
there must be an immediate influence of sudden passion. See id. Here, the situation had been
ongoing for nearly a week. Appellant had been trying to see Estella since Monday and had seen her
with Fernando that Tuesday. He looked for Estella from Tuesday until Friday, when her death
occurred. This does not demonstrate an immediate influence. See Trevino, 100 S.W.3d at 241. 
Estella was unarmed and never pointed a weapon at Appellant, and there was no testimony showing
that Appellant was distressed after shooting his wife. Id. at 239. In fact, after the shooting, he
exchanged gunfire with the officer in the hallway of the lab, threatened Estella’s manager in a back
office, and upon exiting the lab, taunted the officer and pointed the weapon at him.
            The evidence of sudden passion is so weak, contested, and incredible that it could not support
such a finding by a rational jury. See Moore, 969 S.W.2d at 11. The trial court was not presented
with any evidence that Appellant’s situation rendered him incapable of rational thought. See Jones,
963 S.W.2d at 180. Nor does the record support Appellant’s claim that he was acting with sudden
passion arising at the time of the offense. See Trevino, 100 S.W.3d at 238. Point of Error Three is
overruled and the judgment of the trial court is affirmed.

March 17, 2005                                                           
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Panel No. 2
Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)