IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. PD-1437-12





 CODIEM RENOIR WOOTEN, Appellant


v.


THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW

FROM THE FOURTEENTH COURT OF APPEALS

HARRIS COUNTY




 Price, J., delivered the opinion for a unanimous Court. 


O P I N I O N 



 A jury rejected the appellant's self-defense claim, convicted him of murder, and
assessed his punishment at sixty years' confinement in the penitentiary. At the punishment
phase of the trial, the appellant requested a sudden passion instruction. The trial court denied
his request, and the Fourteenth Court of Appeals affirmed the appellant's conviction but
reversed the trial court's judgment with respect to punishment, finding that the trial court
erred by not giving the sudden passion instruction and that the error was "harmful." (1)
According to the court of appeals, the mere fact that the jury might have found in the
affirmative on the sudden passion issue, subjecting him to a maximum sentence of only
twenty years' imprisonment, was alone enough to conclude that the appellant had been
harmed. (2) We granted the State's petition for discretionary review to examine both the court
of appeals's error and harm analyses. We reverse the judgment of the court of appeals with
respect to punishment. 

FACTS AND PROCEDURAL HISTORY

In the Trial Court 

 The appellant was indicted for murder. (3) On the evening of August 29, 2009, the
victim, Kwasi Johnson, went with Derrick Londow to a Houston strip club called Gator's. 
At some point during that same evening, the appellant and his two "girlfriends," one being
Brandi Cleveland, also arrived at Gator's. Cleveland, a prostitute, began approaching men
in Gator's to offer her services. She eventually approached Johnson and Londow, and
Cleveland offered to have sex later that night with the two men for the agreed rate of two
hundred and forty dollars. 

 During the early morning hours of August 30, 2009, Johnson called Cleveland in order
to arrange to pick her up for "the date." Johnson and Londow picked Cleveland up from the
home she shared with the appellant and headed to Johnson's apartment. Once they arrived
at the apartment, Londow left Johnson and Cleveland, and Johnson then attempted to
negotiate a lower price. Cleveland refused the counteroffer, and Johnson offered to drive her
home. In the car, Cleveland notified the appellant that Johnson was bringing her home and
that "the date" was a "no-go," alerting the appellant that Johnson had not delivered payment. 
When they arrived, Johnson brought the car to a halt and Cleveland got out, leaving the front
passenger door open. As Cleveland walked up the path to the house, the appellant
approached her and confirmed that the deal was a "no-go." The appellant then continued
down the path to Johnson, who was sitting in the car.

 At trial, the appellant testified to the events leading up to the shooting and claimed
that he acted in self-defense. Upon approaching Johnson's vehicle, the appellant noted that
Johnson had placed a gun on the console. As the conversation between the men turned to
why "the date" did not happen and why Johnson did not pay Cleveland, Johnson's demeanor
became more combative. According to the appellant, he "[h]eard frustration in [Johnson's]
voice[,]" Johnson began to speak in a "heightened tone[,]" and Johnson began to display a
sort of "aggressiveness" in his speaking. The appellant claimed that, when he pressed
Johnson, asking him to give Cleveland something for her time, Johnson told the appellant,
"fuck you, fuck that bitch, everything you stand for, I'll kill you." 

 A firefight ensued. The appellant's description at trial as to who commenced the
shooting was somewhat inconsistent. On direct examination, he testified 1) that Johnson
shot him in the abdomen as he was reaching for his gun; 2) that Johnson shot him before he
reached for his gun; and 3) that he reached for his gun when he saw the muzzle flash coming
from Johnson's car. When the prosecutor confronted the appellant with these three variations
on cross-examination, the appellant maintained, "I felt the shot as I was reaching for my
handgun." Asked why he shot Johnson, the appellant replied, "Because I felt threatened for
my life, sir. I felt it was self-defense. I felt I was righteous." Johnson's car and body were
found nearby with his handgun still inside the car. The appellant conceded that in his initial
interview with the police, he had failed to tell the police that he acted in self-defense, had a
gun, or shot the victim; instead, he had fabricated a story about being the victim of a drive-by
shooting. 

 Cleveland, the only other eyewitness to the gun battle, gave testimony that largely
substantiated the appellant's description. She testified that she stood close enough to
Johnson's and the appellant's conversation to have heard it. However, according to her
testimony, she "really wasn't paying attention the whole time" and was mostly focused on
her phone. But, after hearing gunshots, she glanced over in time to see a "muzzle flash"
coming from inside of Johnson's car, while simultaneously seeing the appellant raise his arm. 
While ballistic experts and investigators from the Houston Police Department confirmed that
a gun battle took place, in which both men fired multiple shots, none could say which party
fired first. After the close of evidence, the jury was instructed on the law regarding self-defense. However, it found the appellant guilty of murder, necessarily rejecting the
appellant's self-defense claim. 

 The appellant elected to proceed to the jury for the punishment phase of the trial. 
After both sides presented punishment evidence, but before closing arguments, defense
counsel and the trial judge had the following exchange regarding the submission of a sudden
passion instruction to the jury:

 [DEFENSE COUNSEL]: I would request a charge on sudden passion
. . . specifically that [the appellant] stated that once the shooting began that he
was overwhelmed by emotions of fear.


 THE COURT: Once his shooting began?


 [DEFENSE COUNSEL]: Once the shooting began, that he was
overwhelmed by emotions of fear, disorientation, confusion, et cetera. And,
[Y]our Honor, I would argue that this would substantiate the charge.

 

* * *


 THE COURT: . . . Obviously the self-defense has been rejected by the
jury so - - I just don't see it. I'm going to deny that. 


In the absence of a sudden passion instruction, which would have capped the available
punishment at twenty years' confinement, the jury assessed punishment at 60 years in the
penitentiary. 

In the Court of Appeals The court of appeals reversed the trial court's judgment with respect to punishment
and remanded the cause to the trial court for a new punishment hearing. (4) After determining
that the trial court erred not to grant the appellant's request to include a sudden passion
instruction in the punishment phase jury instruction, the court of appeals next proceeded to
determine whether the appellant had been harmed by the lack of the instruction. (5) Because
the appellant expressly requested a sudden passion instruction, the court of appeals correctly
concluded that the record need only demonstrate "some harm" to warrant reversal. (6) The
appellate court then concluded that, "[i]f the jury had determined that [the appellant] acted
out of sudden passion, the offense would have been reduced to a felony of the second degree,
which carries a maximum sentence of 20 years." (7) Thus, the court of appeals found harm on
the basis that the sudden passion instruction could have resulted in the jury finding that the
appellant acted in sudden passion, authorizing a maximum punishment of no more than
twenty years, without addressing the likelihood that the jury actually would have found that
the appellant's behavior resulted from sudden passion on the facts of this particular case. We
granted the State's petition for discretionary review to examine the court of appeals's
holding.

THE LAW

 Prior to September 1, 1994, whether a defendant committed murder under the
immediate influence of sudden passion arising from an adequate cause was an issue that was
litigated at the guilt phase of the trial. (8) If the evidence raised the issue of sudden passion, the
question was submitted to the jury, and it had the option of finding the defendant guilty of
the lesser offense of voluntary manslaughter. (9) Because of certain anomalies generated by
this framework, (10) the Legislature acted in 1993 to remove the crime of voluntary
manslaughter from the Texas Penal Code. (11) Under the current statutory scheme, the question
of whether a defendant killed while under the immediate influence of sudden passion is a
punishment issue. (12)

 Currently, a murder committed under the "immediate influence of sudden passion
arising from an adequate cause" is a second-degree felony carrying a maximum punishment
of twenty years' imprisonment. (13) Sudden passion is "passion directly caused by and arising
out of provocation by the individual killed" which arises at the time of the murder. (14) 
Adequate cause is a "cause that would commonly produce a degree of anger, rage,
resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable
of cool reflection." (15) The defendant has the burden of production and persuasion with
respect to the issue of sudden passion. (16) To justify a jury instruction on the issue of sudden
passion at the punishment phase, the record must at least minimally support an inference: 1)
that the defendant in fact acted under the immediate influence of a passion such as terror,
anger, rage, or resentment; 2) that his sudden passion was in fact induced by some
provocation by the deceased or another acting with him, which provocation would commonly
produce such a passion in a person of ordinary temper; 3) that he committed the murder
before regaining his capacity for cool reflection; and 4) that a causal connection existed
"between the provocation, passion, and homicide." (17) It does not matter that the evidence
supporting the submission of a sudden passion instruction may be weak, impeached,
contradicted, or unbelievable. (18) If the evidence thus raises the issue from any source, during
either phase of trial, then the defendant has satisfied his burden of production, and the trial
court must submit the issue in the jury charge--at least if the defendant requests it. (19)

 When an appellant protests that the trial court erred not to grant his request to charge
the jury regarding sudden passion, a reviewing court must first determine whether the
complained-of error exists. (20) If the reviewing court agrees that a trial court erred by failing
to submit a sudden passion instruction, it then analyzes whether the error harmed the
appellant. (21) Harm does not emanate from the mere failure to include the requested
instruction. (22) A reviewing court undertakes a harm analysis by following the standards as
set out in the Texas Code of Criminal Procedure Article 36.19. (23) If the error is preserved,
the record must demonstrate that the appellant has suffered "some harm." (24) In an Almanza
harm analysis, "burdens of proof or persuasion have no place[.]" (25) Harm must be evaluated
in light of the complete jury charge, the arguments of counsel, the entirety of the evidence,
including the contested issues and weight of the probative evidence, and any other relevant
factors revealed by the record as a whole. (26) To assay harm, we focus on the evidence and
record to determine the likelihood that a jury would have believed that the appellant acted
out of sudden passion had it been given the instruction. (27)



ANALYSIS

Error

 Relying on Daniels v. State, (28) the State argues that the trial court did not err by failing
to include a sudden passion instruction because the appellant's assertion of a "bare claim of
fear" at the trial level did not rise to the level of terror necessary to trigger a sudden passion
instruction. (29) In Daniels, we explained that "a bare claim of" fear will not necessarily
support a claim of sudden passion, but that fear that "rises to the level of 'terror'" will suffice
(if the cause is adequate) to invoke an instruction on the issue. (30) The appellant counters that,
taking his "bare claim" of fear in context of the totality of the circumstances surrounding the
confrontation between the two men, a jury could reasonably infer both that the appellant
experienced sufficient fear to cause him to lose the capacity for cool reflection, and that
Johnson's conduct was adequate to induce such an emotional state in a man of ordinary
temperament. (31) According to the appellant, because there was some evidence to support the
appellant's contention that he "was in the grip of 'passion'" when he shot Johnson, the trial
court should have given the instruction. (32) We conclude that, in any event, whatever error the
trial court may have committed by failing to charge the jury with respect to sudden passion
did not harm the appellant. (33) Finding our harm analysis thus dispositive, we need not address
whether the trial court did, in fact, err not to include the instruction. (34) 

Harm

 This is not our first occasion to address the question of how a jury's rejection of a self-defense claim bears on a reviewing court's Almanza harm analysis with respect to the
erroneous denial of a sudden passion instruction. In Trevino v. State, upon which both the
court of appeals and the appellant principally rely, a jury rejected Trevino's self-defense
claim and convicted him of murder for killing his wife. (35) At the punishment phase of trial,
Trevino requested a sudden passion instruction, but the trial court declined to include it in
the jury charge. (36) We concluded that the trial court erred and turned to whether Trevino was
harmed by the absence of a sudden passion instruction. (37) In conducting a harm analysis, we
did not explicitly invoke the four Almanza considerations. (38) Our inquiry simply focused on
the likelihood that the jury would have found sudden passion based on the state of the record
as a whole. (39) The record revealed two competing theories: 1) Trevino's assertion that he
acted in self-defense, versus 2) the State's claim that Trevino intentionally killed his wife and
subsequently staged the scene to appear as if he had acted only to protect himself. (40)

 Based on the record as a whole, we were unable to declare that, "had it received an
instruction on sudden passion, the jury would not have made an affirmative finding on the
issue[,]" and therefore, we could not say that Trevino did not suffer "some harm." (41) We
explained that a jury could have rejected Trevino's self-defense claim and yet still have
believed that he killed his wife in the heat of passion and staged the scene afterward to
appear as though he acted in self-defense. (42) However, we did not discount the possibility that
"[t]he evidence in a case in which a jury rejected a claim of self-defense could demonstrate
also that the appellant was not harmed by the failure to receive a sudden passion charge[.]" (43) 
We think that this is such a case.

 The success of the appellant's self-defense claim boiled down to whether the jury
would accept that, when he shot at Johnson, he reasonably believed that deadly force was
immediately necessary to protect himself from Johnson's use of deadly force. No other
element of the self-defense claim was refuted by the evidence, which established without
contradiction that a mutual gun battle took place. Moreover, the trial court specifically
admonished the jury "not to consider whether the [appellant] failed to retreat." Therefore,
the jury's rejection of the appellant's self-defense claim demonstrates that the jury simply did
not believe his claim that he reasonably believed deadly force was immediately necessary.

 To reach this conclusion, the jury must have rejected the inference, stemming from
both the appellant's and Cleveland's testimony, that Johnson, not the appellant, fired first. 
This is because, had the jury in fact believed that Johnson fired first, as the appellant
contended, there would have been no impediment to a finding that the appellant reasonably
believed it was immediately necessary to meet Johnson's deadly force with justifiable deadly
force of his own. Under these circumstances, the jury would almost certainly have acquitted
the appellant based on his self-defense claim. But it did not. (44)

 It is highly unlikely that a jury that had already rejected the appellant's claim that he
reasonably believed that deadly force was immediately necessary to defend himself would
nevertheless find in his favor on the issue of sudden passion. To prove sudden passion, the
appellant would have had to establish, inter alia, 1) that he actually acted under the influence
of a fear so great that it caused him to lose his capacity for cool reflection, and 2) that
Johnson's actions were adequate to produce such a degree of fear in a man of ordinary
temperament. But a jury that had already discredited the appellant's claim that he reasonably
believed deadly force to be immediately necessary would be unlikely to believe that, at the
time the appellant first fired, he was actually experiencing a level of fear that caused him to
lose control. Moreover, even had the jury believed that the appellant subjectively
experienced such a level of fear, it would not likely have found that Johnson's behavior
presented a provocation adequate to produce such a degree of fear in a man of ordinary
temperament. Based on the record and evidence before us, it is exceedingly unlikely that the
appellant suffered "some harm" as a result of the trial court's failure to give the jury a sudden
passion instruction based on the appellant's assertion that terror or fear controlled his
actions. (45)

CONCLUSION

 The court of appeals erred to find "some harm" under Almanza simply because the
appellant was subjected to a greater range of punishment than he would have faced had the
jury been instructed on, and found in the appellant's favor with respect to, the issue of sudden
passion. We hold that the court of appeals erred in reversing the trial court's judgment with
respect to punishment. Accordingly, we reverse the judgment of the court of appeals and
affirm the judgment of the trial court.


DELIVERED: June 12, 2013

PUBLISH
1. 

 Wooten v. State, 378 S.W.3d 652, 657 (Tex. App.--Houston [14th Dist.] 2012).
2. 

 Id. ("If the jury had determined that [the appellant] acted out of sudden passion, the offense
would have been reduced to a felony of the second degree, which carries a maximum sentence of 20
years. See Tex. Penal Code § 19.02(d).").
3. 

 Tex. Penal Code § 19.02(b)(1) & (2).
4. 

 Wooten, supra, at 657-58.
5. 

 Id. at 657.
6. 

 Id. at 656-57 (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)
(opinion on reh'g)). 
7. 

 Id. at 657.
8. 

 Trevino v. State, 100 S.W.3d 232, 236 (Tex. Crim. App. 2003) (per curium). 
9. 

 Id. 
10. 

 See Gold v. State, 736 S.W.2d 685, 686 n.1 (Tex. Crim. App. 1987), overruled in part on
other grounds, Torres v. State, 785 S.W.2d 824, 825 (Tex. Crim. App. 1989).
11. 

 See Acts 1993, 73rd Leg., ch. 900, § 1.01, p. 3613, eff. Sept. 1, 1994; Moore v. State, 969
S.W.2d 4, 8 n.1 (Tex. Crim. App. 1998) (discussing the legislative change to move the issue of
sudden passion from the guilt phase of the trial to the punishment phase).
12. 

 Id. 
13. 

 Tex. Penal Code § 19.02(d).
14. 

 Tex. Penal Code § 19.02(a)(2). 
15. 

 Tex. Penal Code § 19.02(a)(1).
16. Tex. Penal Code § 19.02(d).
17. McKinney v. State, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).
18. 

 Id.; Trevino, supra, at 238-39.
19. 

 McKinney, supra, at 569; Trevino, supra, at 238-39. This Court has yet to specifically
address whether sudden passion is a defensive issue in contemplation of Posey v. State, 966 S.W.2d
57 (Tex. Crim. App. 1998). See Rios v. State, 990 S.W.2d 382, 384 (Tex. App.--Amarillo, no pet.)
(holding that sudden passion is a defensive issue for Posey purposes). In Posey, we held that
defensive issues are not "law applicable to the case" under Code of Criminal Procedure Article 36.14
unless and until the defendant raises the issue by a timely objection or request. Tex. Code Crim.
Proc. art. 36.14. Because a defensive issue is not "law of the case," the trial judge has no duty to
instruct the jury sua sponte regarding such an issue, and the failure to instruct cannot be regarded as
fundamental error under Almanza. In the instant case, the issue of sudden passion became "law of
the case" at least by virtue of the appellant's request for the instruction, if not otherwise. See
Trevino, supra, at 242 & n.38 (analyzing the appellant's Almanza complaint regarding the lack of
sudden passion instruction for "some harm," without specifying whether we regarded it as "law of
the case" because Trevino had requested the instruction or, alternatively, because sudden passion is
not a defensive issue in any event). 
20. 

 See Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing Middleton v. State,
125 S.W.3d 450, 453 (Tex. Crim. App. 2003) (plurality opinion)).
21. 

 See Ngo, supra, at 743; Almanza, supra, at 171. 
22. 

 Trevino, supra, at 241.
23. 

 See Tex.Code Crim. Proc. art. 36.19 ("Whenever it appears by the record in any criminal
action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been
disregarded, the judgment shall not be reversed unless the error appearing from the record was
calculated to injure the rights of defendant, or unless it appears from the record that the defendant
has not had a fair and impartial trial.").
24. 

 Trevino, supra, at 242; Almanza, supra, at 171 (citing Tex. Code Crim. Proc. art 36.19). 
25. 

 Warner v. State, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008).
26. 

 Almanza, supra, at 171. See also Ellison v. State, 86 S.W.3d 226, 228 (Tex. Crim. App.
2002) (applying Almanza harm analysis to jury-charge error at the punishment phase of trial). 
27. 

 Trevino, supra, at 243.
28. 

 645 S.W.2d 459, 460 (Tex. Crim. App. 1983). 
29. 

 The appellant actually testified only that he "felt threatened." In requesting the sudden
passion jury instruction, the appellant's counsel asserted that the evidence showed that the appellant
had been "overwhelmed by emotions of fear." To fear is "to be afraid of." Merriam Webster's
Collegiate Dictionary 425 (10th ed. 1996). Terror, on the other hand, is "a state of intense fear." 
Id. at 1217.
30. 

 Daniels, supra, at 460.
31. 

 Appellant's Brief at 24-25.
32. 

 Id. at 24. 
33. In his brief on discretionary review, the appellant at one point alludes to "both anger and
fear." Appellant's Brief at 25. To the extent that this suggests that the evidence also raised "sudden
passion" in the guise of "anger" or "rage," we hold that the trial court did not err by failing to submit
the sudden passion instruction on that account. First, in his request for a sudden passion instruction
before the trial court, the appellant mentioned "fear, disorientation, confusion, et cetera[,]" but never
explicitly claimed anger. While the appellant mentioned anger in passing in his brief before the
court of appeals, he did so only to make the point that being shot in the abdomen would constitute
adequate cause to produce anger or terror in a person of ordinary temperament. He never claimed
to have actually acted out of anger. Appellant's Brief on Direct Appeal at 33.


 Nor would the record support such a claim. At trial, the appellant all but denied having acted
out of anger or rage when he shot Johnson. It is true that Cleveland initially told police that the
appellant looked "angry like he wanted to fight someone[.]" When confronted with this statement
at trial, she clarified that the appellant had not really been "angry at [the victim], but just about the
situation." For his part, the appellant never identified anger as his motivating emotion, and he seems
to have denied on cross-examination that it played any part in causing him to shoot Johnson:

 

 Q. Okay. But you heard [Cleveland], right? Same thing she told the police she told
this jury, you looked like you were ready to fight that guy.

 

 A. I don't remember that, and I don't know nothing about that.

 

 Q. Okay.

 

 A. Had might I been upset? Yes, I was upset. 

 

* * *


 Q. You were sitting there when she got up there and said you were angry enough to
fight that guy, weren't you? 

 

 A. She didn't say that. 


In Daniels, the accused testified that he shot the victim because he feared the victim was attempting
to kill him, but on cross-examination, he acknowledged that he had been "in full control and . . .
knew [he] had to do what [he] did[.]" Daniels, supra, at 461. We held that Daniel's own assessment
of the situation specifically refuted one of the elements required to raise sudden passion--that the
actor lacked the ability for cool reflection. Here, similar to Daniels, the appellant acknowledged that
he was "upset" with Johnson, but the source of his anger seems to have been Johnson's refusal to
pay Cleveland--manifestly not an adequate provocation to cause a person of ordinary temperament
to lose his capacity for cool reflection. He denied actually having experienced anger, much less any
suggestion that he acted under the spell of that particular emotion when he shot Johnson. Instead,
he simply claimed he shot Johnson in self-defense.
34. 

 See Cathey v. State, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) (in reviewing whether
trial court erred by charging the jury on the law of parties, we "assume[d], without deciding, that
error occurred and turn[ed] to the question of harm."). See also Crenshaw v. State, 378 S.W.3d 460,
464 (Tex. Crim. App. 2012) ("Because we hold that the first issue is dispositive, we need not reach
the second issue."); Moore v. State, 371 S.W.3d 221, 225 (Tex. Crim. App. 2012) ("We do not
address these two issues because the other two issues are dispositive of this appeal."); Lakey v.
State, 364 S.W.3d 837, 839 (Tex. Crim. App. 2012) ("Finding our resolution of the second question
dispositive, we need not address the first.").
35. 

 Trevino, supra, at 236.
36. 

 Id.
37. 

 Id. at 241.
38. 

 Id. at 241-43. As in Trevino, our analysis in the instant case centers on the state of the
evidence and the record as a whole, with an eye toward determining the likelihood that the jury
would have accepted the appellant's sudden passion claim. It is true that, in conducting a harm
analysis under Almanza, we will typically also consider the jury charge as a whole as well as the
arguments of counsel. Almanza, supra, at 171. Here, however, as in Trevino, neither the jury charge
as a whole nor the arguments of counsel prove particularly informative. Nothing in the balance of
the jury charge at the punishment phase served to ameliorate the fact that the issue of sudden passion
was simply left out. And, in the absence of a sudden passion instruction, the parties had no occasion
to argue the issue pro or con.
39. 

 Trevino, supra, at 241-43.
40. Trevino attempted to paint a picture of a heated argument, followed by an intense struggle
that ultimately culminated in his wife's death. He told the police that, on the day of the murder, his
wife had become angry at him because she discovered slips of paper with other women's phone
numbers in his wallet. Id. at 233. As her anger escalated, she pointed a .38 caliber revolver at him
and pulled the trigger twice, but the gun failed to fire. Id. Trevino retreated to the bathroom to flush
the offending slips of paper down the toilet and retrieved his 9 millimeter pistol. Id. When Trevino
came out of the bathroom, his wife shot at him again--and this time her gun went off. Id. 
According to Trevino's statement, they struggled over the two guns, and two additional shots were
fired that resulted in his wife's death. Id.


 The State sought to portray a controlling and abusive husband who shot and killed his wife
and then concocted a story of self-defense. To this end, the State adduced testimony that the crime
scene did not match Trevino's claims, that a delay between his wife's death and a call to 911 allowed
him and his family members, who arrived on the scene before the police, to cover his tracks, and that
family members had been observed carrying large black plastic bags from the home on the night of
the murder. Id. at 233-35.
41. 

 Id. at 243.
42. 

 Id. at 242.
43. 

 Id. at 242 (citing Chavez v. State, 6 S.W.3d 56,65 (Tex. App.--San Antonio 1999, pet. ref'd)
(holding that when the State's evidence proved sufficient to negate self-defense, it also proved
sufficient to show lack of harm in the trial court's failure to submit a sudden passion instruction)). 
44. 

 We recognize that a jury could have disregarded the instruction that, if it believed that the
appellant acted in self-defense, it was required to find him not guilty. The jury could have believed
that the appellant acted in self-defense, ignored the instruction that required it to find him not guilty
under those circumstances, and found him guilty anyway. However, we have said that "in the
absence of evidence to the contrary, we will assume that the jury followed its written instructions." 
Miles v. State, 204 S.W.3d 822, 827-28 (Tex. Crim. App. 2006). Accordingly, we will assume that
the jury followed the trial court's instructions and found the appellant guilty because it did not
believe that he acted in self-defense. 
45. In Trevino, even after rejecting the evidence supporting self-defense, the jury could have
relied on separate evidence that it had not yet necessarily discredited to support Trevino's claim of
sudden passion. The jury could have believed that Trevino initially acted in sudden passion and only
later staged the crime scene to make it look like self-defense. That is not the scenario in the instant
case. Here, the same evidence raised both issues, and the jury's rejection of the evidence adduced
to show immediate necessity necessarily indicates that it would not have looked favorably upon the
appellant's claim either that he subjectively experienced the requisite degree of fear or that an
adequate cause for such a degree of fear existed.