

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| PATSY JOY PIERCE, | | No. 08-12-00150-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 355th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Hood County, Texas |
| | § | |
| Appellee. | | (TC # CR11911) |
| | § | |

**O P I N I O N**

Patsy Joy Pierce appeals her conviction of murder. A jury found her guilty of murder as charged in the indictment and assessed her punishment at imprisonment for sixty years. Based on the jury's verdict, the trial court included in the judgment a deadly weapon finding. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

Appellant and her former husband, Jackson Riggs Pierce, lived together in Hood County, Texas.[1] In 2008, a neighbor, Michael Loggains, gave them a puppy which was one-half Pit Bull and one-half Labrador Retriever. On February 26, 2011, the dog got out of the Pierces' yard and went to Loggains' house. Loggains was outside and he put a collar and leash on the dog. The dog pulled and jerked against the leash and hurt Loggains' back. Mr. Pierce had arrived at the

---

[1] Appellant and Mr. Pierce had been married to each other three times and divorced three times, but they had reconciled.

Loggains' house by this time and he apologized. Later that day, Loggains heard seven or eight gun shots and a dog screaming in such a way that Loggains described it as the most horrible sound he had ever heard. Extremely disturbed by what he had heard, Loggains called the police. Loggains told the responding officer, Deputy Sheriff Mel Boschwitz, what he had heard and said he thought the shots may have come from the Pierce residence. Boschwitz went to the Pierce residence to investigate.

Boschwitz spoke with both Mr. Pierce and Appellant. Mr. Pierce appeared visibly upset and had tears in his eyes. He told her that he had just shot his dog and it had been necessary to shoot it several times in order to kill it. Boschwitz described the dog as a "massive" pit-bull mix with several gunshot wounds to the head and upper neck area. Appellant told Boschwitz that the dog had been getting loose and he and Appellant agreed that the dog should be put down out of concern for others. Boschwitz determined that no crime had been committed. She returned to the Loggains residence and told him that Mr. Pierce had put his dog down by shooting it.

The following day, Mr. Pierce went to Loggains' home and apologized for shooting the dog. Loggains described Mr. Pierce as extremely upset and said he explained that he did not intend to hurt the dog when putting it down. Loggains testified that there had been a problem in the neighborhood with dogs running loose and animal control had warned everyone to control of their dogs.

Another neighbor, James Timothy Spurgers, testified there had been a problem in the area with "feral pit bulls roaming the neighborhood" and his sister had been recently attacked by a dog in the neighborhood. Consequently, Spurgers carried a gun whenever he walked his dogs.

Johnny Peoples, like Spurgers, carried a gun when he walked in the neighborhood because several dogs had tried to bite him. The Pierces' dog barked viciously whenever he

walked by their house so Peoples always had his gun ready in the event the dog got out. After Mr. Pierce shot the dog, he apologized to Peoples and explained that he did it because he was afraid of a lawsuit. He also stated that he shot the dog seven times because it did not die from the first shot. Similar to Loggains' testimony, Peoples described Mr. Pierce as extremely upset about shooting the dog. Peoples walked by the Pierce residence several days later and saw Appellant and Mr. Pierce talking outside. He observed Appellant as having a sad expression and he could tell she was upset about something.

On March 3, 2011, Deputy Sheriff Jonathan Thomas Berry responded to a call from the Pierce residence. Appellant told Berry that her husband had shot her dog because it was "aggressive." Appellant was very upset about Mr. Pierce killing her dog and she believed it was "cruelty to animals." Berry told Appellant that an owner of an animal has a right to put down their own dog. Berry characterized Appellant as angry at her husband for killing the dog and she thought law enforcement should do something about it. A little over a week later, on March 11, 2011, Appellant called 911 stating she had shot her husband. Deputy Berry was the first officer to arrive. Appellant exited the residence with a gun in her hand. Berry ordered her to drop the weapon and Appellant complied, stating, "I shot him because he threatened to kill me." Appellant did not have any injuries.

Appellant called 911 at 10:27 a.m. on the morning of the shooting. The State introduced into evidence a recording of the 911 call. During the twelve-minute call, Appellant was crying and made several statements related to the shooting. At the beginning of the call, she stated, "My husband killed my dog and he was going to kill me." She stated several times that she shot Mr. Pierce and he had said he was going to kill her. Appellant refused to comply with the 911 operator's command to put down the weapon because they had other guns in the house and she

believed Mr. Pierce would get a gun and kill her. The 911 operator, Georgianna Feind, asked Appellant if Mr. Pierce was assaulting her when she shot him, and Appellant replied, "He said he was going to kill me. He said he was going to kill me. I can't let him kill me." Appellant told Feind that Mr. Pierce did not have a gun when he threatened her and they had not been arguing about anything. However, when Feind asked whether Mr. Pierce was breathing and able to talk, Appellant became furious and began screaming at Mr. Pierce, stating "I'll kill you. You shut up. You don't say anything." She explained to Feind that she did not want Mr. Pierce to speak because he would say terrible things about her. At other times during the call, Appellant stated, "I do bad things."

George Grim, a paramedic who responded to the Pierce residence call, testified that Mr. Pierce told him that his wife had shot him "point blank" with a nine millimeter. Mr. Pierce also stated that his wife shot him because he had killed her dog.

William Watt, a Hood County Sheriff's Investigator, conducted a custodial interview of Appellant at the Sheriff's Office and the video recording of that interview was admitted into evidence. Appellant explained that they had gone to bed at approximately 9 p.m. the night before the shooting and had not been arguing about anything. The following morning, they arose around 7 a.m. and Appellant made breakfast. They were not arguing but Mr. Pierce kept talking about the dog. She believed he had shot the dog because he hated her and she loved the dog. Mr. Pierce went outside for a while and when he came back in the house, Appellant heard him say as he was coming up the stairs that he was going to kill her. He was not yelling or angry, and they were not arguing. Appellant got a 9 mm handgun out of her purse and went into the bathroom but she did not shut the door. When Mr. Pierce got near the bathroom, Appellant told him to stay away from her and shot him one time. She stated several times that she shot him to

keep him from killing her. In the interview when asked to describe what she was feeling when she shot her husband, Appellant described how Mr. Pierce had "killed the dog real bad." Appellant also said that Mr. Pierce had threatened to kill her in the past and had pointed a gun at her but he had not done so recently. When Watt asked Appellant whether she knew what she was doing when she pointed the gun at Mr. Pierce and pulled the trigger, Appellant stated: "I was keeping him from killing me. He said he was going to kill me. And I didn't want him to kill me." She added, "I didn't want to do it, but I knew if I didn't, I knew he would kill me."

Sarah Dawn Pierce, the daughter of Appellant and Mr. Pierce, testified that she was going to take her children to visit their grandparents during Spring break, but Appellant called her on March 3, 2011 and said she would not be able to watch them and could not be responsible for them. Sarah called her father to ask what was going on. Appellant called Sarah again on March 7, 2011 and left a message saying that she was a good daughter, nothing was her fault, and Appellant could not have asked for a better daughter. In a second message left that same day, Appellant told Sarah in a stern voice not to call her father. Sarah stayed with her father in the hospital for several days prior to his death from the gunshot wound on March 24, 2011. Shortly before his death, Mr. Pierce told Sarah, "She killed me." Mr. Pierce told Sarah that he had been working on his truck and went inside to get a cup of coffee. As he rounded a corner near the bathroom, he heard a boom and realized he had been shot. He asked Appellant to call 911 and she told him to just die because she had done what she should have done a long time ago.

The trial court included in the guilt-innocence charge an instruction on the law of self-defense. The jury rejected that defense and found her guilty of murder by shooting Mr. Pierce with a firearm as alleged in the indictment. The trial court refused Appellant's request to include

a sudden passion instruction in the punishment charge. The jury assessed Appellant's punishment at imprisonment for sixty years.

## CHARGE ERROR

In her sole issue on appeal, Appellant asserts that the trial court erred by refusing her request for a sudden passion instruction in the punishment charge. During the punishment phase of a murder trial, the defendant may raise the issue of whether she caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX.PENAL CODE ANN. § 19.02(d)(West 2011). If the defendant succeeds in proving the issue of sudden passion by a preponderance of the evidence, the offense is a felony of the second degree rather than of the first degree. TEX.PENAL CODE ANN. § 19.02(d); *Trevino v. State*, 100 S.W.3d 232, 237 (Tex.Crim.App. 2003).

*Standard of Review*

Appellate review of alleged jury charge error generally involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g); *see Sakil v. State*, 287 S.W.3d 23, 25-26 (Tex.Crim.App. 2009). First, we must determine whether error occurred. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex.Crim.App. 2013); *Abdnor*, 871 S.W.2d at 732. If so, we must then analyze whether sufficient harm resulted from the error to require reversal. *Wooten*, 400 S.W.3d at 606. Under this second step, the degree of harm necessary for reversal usually depends on whether the appellant properly preserved the error by objection. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003). If the appellant objected to the charge, we determine whether there is "some harm." *Sakil*, 287 S.W.3d at 25-26. If the appellant did not object, we will not reverse unless the record demonstrates "egregious harm." *Id.* at 26. The standard of review is

somewhat different when the appellant complains that the trial court failed to instruct the jury on a defensive issue.

Article 36.14 requires the trial court to deliver to the jury, except in pleas of guilty where a jury has been waived, a written charge distinctly setting forth the law applicable to the case. TEX.CODE CRIM.PROC.ANN. art. 36.14 (West 2007); *see Delgado v. State*, 235 S.W.3d 244, 249 (Tex.Crim.App. 2007)(stating that the trial judge is ultimately responsible for the accuracy of the jury charge and accompanying instructions). The trial judge has the duty to instruct the jury on the law applicable to the case even if defense counsel fails to object to inclusions or exclusions in the charge. *Taylor v. State*, 332 S.W.3d 483, 487 (Tex.Crim.App. 2011). Article 36.14 does not impose any duty on a trial judge to instruct the jury *sua sponte* on unrequested defensive issues because an unrequested defensive issue is not the law "applicable to the case" and the failure to instruct cannot be regarded as fundamental error under *Almanza*. *Wooten*, 400 S.W.3d at 605 n.19; *Vega v. State*, 394 S.W.3d 514, 519 (Tex.Crim.App. 2013); *Posey v. State*, 966 S.W.2d 57, 62 (Tex.Crim.App. 1998)(holding that defensive issues are not "law applicable to the case" under Article 36.14 unless and until the defendant raises the issue by a timely objection or request).

The Court of Criminal Appeals noted in *Wooten* that it has not yet determined whether a sudden passion instruction is a defensive issue under *Posey*. *Wooten*, 400 S.W.3d at 605 and n.19. The Fort Worth Court of Appeals held that a sudden passion instruction is a defensive issue, and therefore, the trial court was not required, absent a request from the appellant, to instruct the jury on sudden passion during punishment phase of murder trial. *Swaim v. State*, 306 S.W.3d 323, 325 (Tex.App.--Fort Worth 2009, pet. ref'd). We applied *Swaim* in a case transferred to us from the Fort Worth Court of Appeals. *Wilson v. State*, No. 08-11-00042-CR,

2013 WL 461060, at \*8 (Tex.App.--El Paso Feb. 6, 2013, pet. ref'd); *see* TEX.R.APP.P. 41.3 (requiring transferee court to decide a transferred case in accordance with the precedent of the transferor court under principles of *stare decisis* if its decision otherwise would be inconsistent with the precedent of the transferor court). In this case, unlike *Swaim* and *Wilson*, Appellant requested a sudden passion instruction; consequently, it is a "law applicable to the case." *See Wooten*, 400 S.W.3d at 605. Under this scenario, we will determine whether the trial court erred by denying Appellant's request to instruct the jury on sudden passion, and if we find error, we will analyze whether the error resulted in some harm to Appellant. *Wooten*, 400 S.W.3d at 606.

*Applicable Law*

At the punishment stage, the defendant may raise the issue as to whether she caused the death under the immediate influence of sudden passion arising from an adequate cause. TEX.PENAL CODE ANN. § 19.02(d). The Penal Code defines sudden passion as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX.PENAL CODE ANN. § 19.02(a)(2). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX.PENAL CODE ANN. § 19.02(a)(1). The defendant has the burden of production and persuasion with respect to the issue of sudden passion. *Wooten*, 400 S.W.3d at 605.

To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must support an inference: (1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) that her sudden passion was in fact induced by some provocation by the deceased or another acting with him, which

- 8 -

provocation would commonly produce such a passion in a person of ordinary temper; (3) that she committed the murder before regaining her capacity for cool reflection; and (4) that a causal connection existed "between the provocation, passion, and homicide." *Wooten*, 400 S.W.3d at 605. We are required to view the evidence in the light most favorable to the requested defensive instruction. *See Bufkin v. State*, 207 S.W.3d 779, 782 (Tex.Crim.App. 2006). It does not matter that the evidence supporting the submission of a sudden passion instruction may be weak, impeached, contradicted, or unbelievable. *Wooten*, 400 S.W.3d at 605. If the evidence raises the issue from any source, during either phase of trial, then the defendant has satisfied his burden of production, and the trial court must submit the issue in the jury charge. *Id.*

*Immediate Influence of*
*Terror, Anger, Rage, or Resentment*

Appellant argues in her brief that the evidence supports an inference that she was acting under the immediate influence of fear when she shot Mr. Pierce. The State responds that there is no evidence that Appellant in fact acted under the immediate influence of a sudden passion at the time of the shooting or that she committed the murder before regaining the capacity for cool reflection. Evidence that the defendant acted in response to provocation with no evidence that the defendant was acting under the immediate influence of sudden passion at the time of the murder is insufficient to support a sudden passion instruction. *Trevino*, 100 S.W.3d at 241.

In *Daniels v. State*, 645 S.W.2d 459, 460 (Tex.Crim.App. 1983), the Court of Criminal Appeals held that a defendant's assertion of a "bare claim of fear" does not necessarily support a claim of sudden passion. Fear constitutes "sudden passion" when its cause is such that would commonly produce a degree of terror "sufficient to render the mind incapable of cool reflection." *Daniels*, 645 S.W.2d at 460; *see Wooten*, 400 S.W.3d at 606 n.29 (comparing definitions of "fear" and "terror" and observing that fear means "to be afraid of" whereas "terror" is defined as

a "state of intense fear"). The defendant in *Daniels* testified that when he shot the deceased he was in fear of his life, but his testimony that he acted "in full control" revealed he had reflected on his action, knew what he had to do, and did it, so that there was no evidence that his fear rendered his mind incapable of cool reflection. *Id.*

Appellant stated during the 911 call that she had shot Mr. Pierce because she heard him state as he came up the stairs that he was going to kill her. After retrieving the gun from her purse, she went into the bathroom but did not close the door. When Mr. Pierce entered the area, she told him to stay back, but he did not stop so she shot him once. She also stated several times during the 911 call her belief that Mr. Pierce was going to kill her. During the custodial interview, Appellant stated that Mr. Pierce had threatened to kill her, had pointed a gun at her, and had hurt her in the past but had not done so recently. She also said that she was afraid "all the time." There is no evidence, however, that her fear rose to the level of terror such that it rendered her mind incapable of cool reflection at the time she shot Mr. Pierce. To the contrary, Appellant stated that she did not want to shoot him, but she knew if she did not do it, he would kill her. Appellant also had time to retrieve her gun from her purse, go into the bathroom, and wait for Mr. Pierce to walk toward the bathroom. This evidence demonstrates that Appellant contemplated what action she had to take before she acted. Like the defendant in *Daniels*, Appellant's own statements show that she was in fear for her life, knew what she had to do, and did it. There is no evidence that the fear experienced by Appellant rendered her mind incapable of cool reflection at the time she shot Mr. Pierce. For this reason alone, Appellant was not entitled to a sudden passion instruction.

### *Provocation and Adequate Cause*

Appellant was also required to show that her sudden passion was in fact induced by some

provocation by the deceased that would commonly produce such a passion in a person of ordinary temper. The State contends there is no evidence that the victim did anything that could produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. While Appellant claimed to have heard Mr. Pierce state as he walked up the stairs that he was going to kill her, she presented no evidence that his statement would cause a person of ordinary temper to believe Mr. Pierce was in fact about to assault her. They had not been arguing about anything that morning and he was not angry with her. Although he had threatened to kill her in the past and had pointed a weapon at her, he had not done so in at least six months. Further, Mr. Pierce was not engaged in any conduct which would indicate to a person of ordinary temper that he was reaching for a weapon, acting aggressively, or otherwise preparing to assault her just before she shot him. We conclude that there is no evidence that the victim did anything to produce the degree of terror in a person of ordinary temper sufficient to render her mind incapable of cool reflection. Given our conclusion regarding these elements of sudden passion, it is unnecessary to address the remaining element. The trial court did not err by denying Appellant's request for a sudden passion instruction.

*Absence of "Some Harm"*

Even if it could be said that the trial court erred by failing to instruct the jury on sudden passion, we find that it did not harm Appellant. Reversal is not required in this case unless the record supports a finding of "some harm." *See Wooten*, 400 S.W.3d at 606. Harm does not emanate from the mere failure to include the requested instruction. *Wooten*, 400 S.W.3d at 606. Harm must be evaluated in light of the complete jury charge, the arguments of counsel, the entirety of the evidence, including the contested issues and weight of the probative evidence, and any other relevant factors revealed by the record as a whole. *Id.* To assay harm, we focus on the

evidence and record to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction. *Id.*

In this case, we are faced with examining harm in light of the jury's rejection of Appellant's self-defense claim. The Court of Criminal Appeals has considered whether the absence of a sudden passion instruction harmed the defendant where the jury had rejected the defendant's claim of self-defense. In *Trevino v. State*, 100 S.W.3d 232, 236 (Tex.Crim.App. 2003), a jury rejected Trevino's self-defense claim and convicted him of murdering his wife. The trial court refused to instruct the jury on sudden passion at punishment. *Id.* at 236. There were two competing theories at trial: (1) Trevino's claim that he acted in self-defense; and (2) the State's claim that Trevino intentionally killed his wife and staged the scene after the murder to make it appear as if he had acted to protect himself. *Trevino*, 100 S.W.3d at 233-35; *see Wooten*, 400 S.W.3d at 608 (summarizing the two competing theories). After reviewing the entire record, the Court of Criminal Appeals found that the jury could have rejected the self-defense claim and yet still believed that Trevino killed his wife in the heat of passion and staged the scene afterward to appear he had acted in self-defense. *Trevino*, 100 S.W.3d at 242. Thus, the Court found some harm because it could not say that had the jury received an instruction on sudden passion, the jury would not have made an affirmative finding on the issue. *Id.* at 243.

The Court of Criminal Appeals addressed this same issue of harm more recently in *Wooten*. Wooten and two "girlfriends" who were prostitutes went to a strip club. *Wooten*, 400 S.W.3d at 602. One of the prostitutes, Cleveland, approached two men in the club, Londow and Johnson, and agreed to go on a "date" with both of them for the agreed rate of two hundred and forty dollars. *Id.* Later than evening, Johnson and Londow picked up Cleveland from the home she shared with Wooten and went to Johnson's apartment. *Id.* at 603. Londow subsequently left

and Johnson attempted to negotiate a lower price, but Cleveland refused. *Id.* While Johnson drove her back to her home, Cleveland notified Wooten that the date was a "no go." *Id.* When they arrived, Cleveland got out of the car and told Wooten again that the date was a "no go." *Id.* Wooten approached the vehicle and began talking to Johnson who had placed a handgun on the console of his car. *Id.* The two men argued and it eventually erupted into a gun battle with both men firing at each other. *Id.* Wooten was struck by a bullet in the abdomen and Johnson died from his injuries. *Id.* Wooten testified somewhat inconsistently with respect to which man had reached for his weapon first, but he claimed Johnson had fired at him first. *Id.* Wooten initially told the police he had been shot in a drive-by shooting and did not tell them he had a gun or had acted in self-defense. *Id.* At trial, however, he claimed he had shot Johnson in self-defense. *Id.* The jury rejected Wooten's self-defense claim and found him guilty of murder. *Id.* The trial court refused to give a sudden passion instruction in the punishment charge. *Id.* at 604.

The Court of Criminal Appeals examined whether Wooten was harmed by the court's failure to submit a sudden passion instruction at punishment when the jury had rejected his self-defense claim. *Wooten*, 400 S.W.3d at 607-09. This analysis "centers on the state of the evidence and the record as a whole, with an eye toward determining the likelihood that the jury would have accepted the appellant's sudden passion claim." *Wooten*, 400 S.W.3d at 608 n.38. The only contested element of Wooten's self-defense claim was whether Wooten reasonably believed deadly force was immediately necessary to protect himself from Johnson's use of deadly force. *Id.* at 609. The Court of Criminal Appeals concluded that the jury's rejection of Wooten's self-defense claim demonstrated that the jury simply did not believe his claim in that regard and the jury necessarily rejected the inference that Johnson had fired first. *Id.* To prove sudden passion, Wooten had to establish that he actually acted under the influence of a fear so

great it caused him to lose his capacity for cool reflection and Johnson's actions were adequate to produce such a degree of fear in a man of ordinary temperament. *Id.* Because the jury had already discredited Wooten's claim that he reasonably believed deadly force was immediately necessary, it would be unlikely to believe that at the time Wooten fired the gun he was actually experiencing a level of fear that caused him to lose control. *Id.* at 609-10. Similarly, the jury would not likely have found that Johnson's behavior presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament. *Id.* at 610. Thus, the Court concluded that it was exceedingly unlikely that Wooten suffered some harm as a result of the trial court's failure to include the sudden passion instruction in the punishment charge. *Id.*

In the instant case, there were two competing theories during the guilt-innocence stage: (1) Appellant's claim that she acted in self-defense; and (2) the State's claim that Appellant intentionally shot Mr. Pierce because he had shot her dog two weeks earlier, and she fabricated the claim that she had shot him in self-defense. For the jury to find Appellant shot Mr. Pierce in self-defense, the jury had to find that Appellant reasonably believed deadly force was immediately necessary to protect her from his use or attempted use of deadly force against her.

The jury could have rejected the claim of self-defense because it disbelieved Appellant's assertions after the shooting that Mr. Pierce had threatened to kill her just before she shot him. To prove sudden passion, Appellant had to establish that she actually acted under the influence of a fear so great that it caused her to lose her capacity for cool reflection and that Mr. Pierce's words were adequate to produce this degree of fear in a person of ordinary temperament. A jury that did not believe Mr. Pierce had made such a threat could not rationally find that Appellant was experiencing the degree of fear that would cause her to lose control or that Mr. Pierce's alleged threat amounted to adequate provocation. Even if the jury believed Mr. Pierce had

- 14 -

uttered the threat when he walked into the house, the jury still could have rejected self-defense if it found that Appellant's use of deadly force was not immediately necessary to protect her against Mr. Pierce's threat. It is undisputed that Mr. Pierce was unarmed when he was shot, they were not arguing or yelling at one another, he was not running or moving fast, and he was not making a move to retrieve a weapon. A jury that rejected self-defense under these circumstances would be highly unlikely to find that Mr. Pierce's words amounted to provocation adequate to produce the requisite degree of fear in a person of ordinary temperament. *See Wooten*, 400 S.W.3d at 609-10. We are unable to conceive of a scenario where the jury could have rejected Appellant's self-defense claim based on Mr. Pierce's threat to kill her but still could have found that Appellant killed Mr. Pierce while experiencing terror arising from that same threat to kill her. Consequently, any error in denying the instruction did not result in any harm to Appellant.

*Response to the Dissent*

The dissent concludes that the case should be reversed and remanded for a new punishment hearing because the evidence raises sudden passion. As discussed above, a defendant is entitled to a sudden passion instruction if there is evidence that: (1) the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection; and (4) a causal connection existed "between the provocation, passion, and homicide." *Wooten*, 400 S.W.3d at 605. Significantly, the dissent does not address the second or fourth elements of sudden passion.

The dissent's analysis is related to the first and third elements of sudden passion and it

focuses primarily on Appellant's statements and demeanor during the 911 call as some evidence that she was afraid for her life when she shot Mr. Pierce. When determining whether a sudden passion instruction should be given, it is not enough that Appellant was experiencing fear when she shot her husband. The critical question is whether Appellant's fear rose to the level that it overwhelmed her ability to contemplate the course of action she should take, or in the words of the statute, rendered her mind incapable of cool reflection. There is no evidence in the record of how much time passed from the time of the shooting to when Appellant called 911, but there is evidence that Appellant delayed calling 911. It is unreasonable to infer that the state of mind she exhibited during the 911 call is the same state of mind she had at the moment she pulled the trigger.

In analyzing the issue of harm, the dissent simply concludes Appellant was harmed because she faced the range of punishment for a first degree felony rather than a second degree felony. As the Court of Criminal Appeals noted in *Wooten*, harm does not emanate from the mere failure to include the requested instruction. *Wooten*, 400 S.W.3d at 606. The dissent does not evaluate harm in light of the entirety of the evidence and the analysis does not attempt to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction as required by *Wooten*.

*Conclusion*

We conclude that the trial court did not err by denying Appellant's request for a sudden passion instruction, and even if there is error, it is harmless because it is highly unlikely that the jury, having rejected the claim of self-defense based on Mr. Pierce's alleged threat to kill Appellant, would find that Appellant killed her husband because his threat rendered her mind incapable of cool reflection. Accordingly, we overrule the sole issue presented on appeal and

affirm the judgment of the trial court.


April 23, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J., dissenting

(Do Not Publish)