COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-119-CR
  
  
TOMMY TREVINO                                                                 APPELLANT
  
V.
  
THE STATE OF TEXAS                                                                  STATE
  
  
------------
 
FROM THE CRIMINAL DISTRICT 
COURT NO. 4 OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Tommy Trevino appeals his conviction for murder. In a single point, appellant 
contends that the evidence is factually insufficient to negate the defensive 
issue of sudden passion. We will affirm.
        Appellant 
was tried for the murder of his wife, Michelle Trevino, in the fall of 1999. A 
jury found him guilty of murder and sentenced him to sixty years’ confinement. 
Appellant appealed his sentence, contending that the trial court erred by 
failing to instruct the jury on sudden passion. Trevino v. State, 60 
S.W.3d 188, 192 (Tex. App.—Fort Worth 2001), aff’d, 100 S.W.3d 232, 
239 (Tex. Crim. App. 2003). We reversed the trial court and remanded the case 
for a new trial on punishment. Id. at 195. The following facts were 
adduced on retrial.
        At 
the time of her death, the deceased and appellant had been together for about 
nine years. Appellant admitted that he had been unfaithful to the deceased 
during their marriage.[1]  His infidelity had 
been a source of conflict between them. For instance, one time when appellant 
came home with hickeys on his neck, the deceased allegedly pointed a gun at him 
while he slept.  She told appellant’s brother that she would have shot 
appellant if he had not been holding their daughter.  Despite their 
problems, appellant attended family events with the deceased and helped her 
raise their two children.
        About 
three months before the murder, the deceased told appellant that she wanted a 
divorce. After that, appellant started paying more attention to her. He would 
take her out to lunch, buy her flowers, and take her to dance clubs, which the 
deceased enjoyed. Although their relationship improved for a while, the deceased 
indicated that they were having problems again just two days before her murder.
        The 
deceased worked various jobs throughout their marriage. At the time of her 
death, she was earning minimum wage, and appellant was unemployed because of 
neck injuries he sustained in a car accident. The deceased completed some 
applications for higher paying jobs, though she did not submit them. On the day 
of her murder, however, the deceased told her employer that she had a job 
interview and arranged to work a later shift.
        The 
State argued that appellant disapproved of the deceased’s plan to find a 
higher paying job because it would increase her independence and ability to 
leave him.[2]  According to the State, appellant 
murdered the deceased because she was going to leave him and he did not want her 
to be with anyone else. Appellant disagreed with the State’s proffered motive 
and testified that he shot the deceased because she shot at him.
        According 
to appellant, he and the deceased were both at home around noon on December 1, 
1997. As appellant sat on his living room sofa watching television, the deceased 
looked through his wallet and found a woman’s phone number. She then pointed 
an empty revolver at him, demanded to know who the woman was, and pulled the 
trigger twice. Appellant’s heart “jumped in [his] chest.” In a state of 
terror, appellant took a nine millimeter pistol out of the living room closet 
and went into the bathroom, closing the door behind him. He used the bathroom 
and flushed the phone numbers down the toilet. As he exited the bathroom into 
the dark hallway, he heard a gunshot “right in front of [his] face.” At that 
point, he started shooting and tried to knock the revolver out of the 
deceased’s hand. After the shooting, appellant called his sister, who went to 
his house and then called 911. She told the operator that appellant shot the 
deceased with a gun he had taken away from her.
        The 
first police officer to arrive on the scene saw appellant kneeling next to the 
deceased. Appellant appeared distraught and told him to help the deceased. The 
deceased was lying across the threshold of the bathroom, with her upper body in 
the bathroom and her legs extended into the hallway. The officer noticed a 
revolver lying in the hall. He asked appellant to move away from the deceased 
and come towards him; appellant complied. He was then handcuffed by a second 
police officer, who led him out of the house. Both the second officer and 
firefighters passing appellant as they entered the house testified that he 
looked calm.
        Emergency 
personnel determined that the deceased was not breathing and did not have a 
pulse or heartbeat. The condition of her body led them to believe that she had 
“been down for a while.” The deceased was pronounced dead at the scene.
        The 
deceased had a total of six bullet wounds. The first bullet entered her left hip 
and exited through her right buttock, the second bullet entered the left side of 
her head and exited through the right side of her head, and the third bullet 
entered the center of the front of her chest and exited through her back. A 
blood smear on the hallway wall was consistent with the exit wound from the hip 
shot and indicated that the deceased had slid down against the wall to the 
floor. Although the deceased could have continued to struggle after the first 
shot, the shot to her head would have caused immediate shock and rendered the 
deceased incapable of any volitional movement. The lack of bleeding from the 
chest wound, which was inflicted as the deceased lay upon the floor, indicated 
that she had been in a state of shock when she sustained it. Appellant fired all 
three shots from the nine millimeter pistol within a short span of time.[3]
        A 
fourth shot, from the revolver found in the hallway, struck the upper part of 
the wall at the end of the hallway. Investigators found bullets for the revolver 
in the master bedroom’s closet. To reach the closet from the living room, one 
would have to walk past the bathroom door. Although the revolver emits a cloud 
of gunpowder when fired, neither the deceased nor appellant had any measurable 
amounts of gunpowder on their hands. The revolver did not have any identifiable 
fingerprints on it. The deceased’s manicured fingernails were in perfect 
condition and did not contain any traces of appellant’s skin or blood.
        After 
hearing the evidence, the jury failed to find that appellant acted under the 
influence of sudden passion and assessed punishment of life in prison.
        In 
his sole point, appellant contends that the evidence is factually insufficient 
to negate the defensive issue of sudden passion. He argues that when the entire 
record is considered and the State’s evidence is balanced against 
appellant’s mitigating evidence, the record is factually insufficient to 
negate the defensive theory. Appellant misstates the State’s burden of proof.
        The 
State was not required to negate the existence of sudden passion. Rather, 
appellant had the burden of proving it by a preponderance of the evidence. Naasz 
v. State, 974 S.W.2d 418, 420 (Tex. App.—Dallas 1998, pet. ref’d). 
Accordingly, we review appellant's point as complaining that the jury's failure 
to find that he was under the influence of sudden passion when he murdered the 
deceased was against the great weight and preponderance of the evidence. See 
id.; Hernandez v. State, 127 S.W.3d 206, 212 (Tex. App.—Houston [1st 
Dist.] 2003, no pet.); Bumguardner v. State, 963 S.W.2d 171, 176 (Tex. 
App.—Waco 1998, pet. ref'd); Meraz v. State, 785 S.W.2d 146, 155 (Tex. 
Crim. App. 1990).
        In 
reviewing this point, we must consider all of the evidence relevant to the issue 
of sudden passion and determine whether the verdict is so against the great 
weight and preponderance of the evidence as to be manifestly unjust. Meraz, 
785 S.W.2d at 155. We are to give deference to the fact finder’s 
determinations, including determinations involving the credibility and demeanor 
of witnesses. Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 
2004); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). We may 
not substitute our judgment for that of the fact finder’s. Zuniga, 144 
S.W.3d at 482.
        At 
the punishment stage of a murder trial, the defendant may raise the issue of 
whether he caused the death under the immediate influence of sudden passion 
arising from an adequate cause. Tex. Pen. 
Code Ann. § 19.02(d) (Vernon 2003). "Sudden passion" means 
passion directly caused by and arising out of provocation by the individual 
killed or another acting with the person killed that passion arises at the time 
of the offense and is not solely the result of former provocation. Id. § 
19.02(a)(2). "Adequate cause" means cause that would commonly produce 
a degree of anger, rage, resentment, or terror in a person of ordinary temper, 
sufficient to render the mind incapable of cool reflection. Id. § 
19.02(a)(1). The accused may not rely upon a cause of his own making, such as 
precipitating a confrontation. Naasz, 974 S.W.2d at 423. If the defendant 
proves sudden passion by a preponderance of the evidence, the offense is 
punished as a second-degree felony. Tex. 
Pen. Code Ann. § 19.02(d).
        Appellant’s 
sudden passion argument was based on his testimony that he shot the deceased in 
a state of terror caused by the deceased’s shooting the revolver at him.[4] The jury was free to make its own determination of 
appellant’s credibility and reject appellant’s version of events if it did 
not believe he was telling the truth. See Zuniga, 144 S.W.3d at 
481; Cain, 958 S.W.2d at 407. The jury could have doubted appellant’s 
story based on his strange response to the deceased’s allegedly firing the 
pistol at him twice or the lack of physical evidence to support his contentions 
that she fired the revolver and struggled with him.
        In 
addition to his testimony, appellant cites the presence of the revolver in the 
hallway and a bullet from that revolver in the hallway wall, his brother’s 
testimony that the deceased previously pointed a gun at appellant when she was 
angry with him, and his demeanor as observed by the first police officer to 
arrive at the scene. None of this evidence, however, compelled the jury to find 
that appellant murdered the deceased under the influence of sudden passion.
        The 
fact that the revolver had been fired did not prove that it had been fired by 
the deceased. Moreover, even if the jury believed appellant’s brother’s 
testimony about the deceased’s pointing a gun at appellant in the past, it was 
not bound to conclude that she did so on the day of her murder. Without the 
deceased’s fingerprints on the revolver or gun powder on her hands, the jury 
could have concluded that appellant fired the revolver after he murdered the 
deceased to make it look like self-defense.
        Further, 
the fact that appellant appeared distraught to the police officer who first 
arrived on the scene did not require the jury to believe that he was in a state 
of terror when he committed the murder. The testimony merely showed that 
appellant acted like he wanted the officer to help the deceased after she was 
already dead. The jury could have weighed that testimony against the testimony 
that appellant seemed calm just minutes after he appeared distraught and the 
fact the appellant called his sister, rather than 911, after the shooting and 
concluded that his demeanor was contrived.
        After 
weighing all of the evidence, we conclude that the jury’s failure to find that 
appellant murdered his wife under the immediate influence of sudden passion was 
not so contrary to the great weight and preponderance of the evidence as to be 
clearly wrong and unjust. Accordingly, we overrule appellant’s sole point and 
affirm the judgment of the trial court.
  
  
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
 
PANEL A:   CAYCE, 
C.J.; DAUPHINOT and WALKER, JJ.
 
PUBLISH
 
DELIVERED: February 3, 2005


NOTES
1.  
Appellant testified that the deceased had also been unfaithful to him.
2.  
Appellant denied that he was opposed to the deceased finding a better job.  
To the contrary, he had encouraged her find a higher paying job because they 
were having financial difficulties.  He said that his brother had been 
trying to get her a job at the Nissan plant in Irving.
3.  The 
nine millimeter pistol was found on the living room floor. Its clip had been 
emptied, with the bullets left next to the gun.  Appellant did not remember 
emptying it.
4.  We 
note that even if the deceased did fire the pistol, that act would not 
constitute adequate cause because it was precipitated by appellant’s 
conduct.  According to appellant, the deceased fired the pistol at him 
because he brought a woman’s phone number home in his wallet.  Because a 
defendant arguing sudden passion may not rely upon cause of his own making, Naasz, 
974 S.W.2d at 423, the deceased’s alleged firing of the pistol does not 
support legally adequate cause.  The State did not raise this issue at 
trial, however.