In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00064-CR**
_____

**RICHARD GRANT ALLEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 16-24343**

**MEMORANDUM OPINION**

The grand jury indicted Richard Grant Allen for the offense of aggravated assault, a second-degree felony, alleging Allen used his hand as a deadly weapon and caused serious bodily injury to another. *See* Tex. Penal Code Ann. § 22.02(a)(1), (b) (West 2011). Allen pled not guilty. Allen was tried and convicted by a jury. The jury assessed punishment at five years suspended and probated over a period of five

1

years, and a $5,000.00 fine.[1] Allen appeals his conviction. In one issue, Allen complains the trial court committed reversible error by refusing to charge the jury on self-defense.

## I. Background

### A. Testimony of the Complainant

On the night of September 23, 2015, Floyd Williams, the complainant, was at a bar in Jefferson County, Texas. Williams testified he drove his white Chevrolet Z71 pickup to the bar around 5 or 6 p.m. He testified he was not intoxicated when he arrived at the bar and consumed no alcohol before arriving. Williams testified he only had three beers that evening while at the bar and disputed that he was intoxicated to the level that the bar refused to serve him any more alcohol. Williams did not recall tripping and falling and hitting his head.

Williams conveyed that after he finished his last beer, he left through the front door about 6 or 7 p.m. He walked across the street to the parking lot where somebody jumped him from behind, grabbed him, and put him in someone else's truck. Williams testified he then started "pounding on the guy's face." Williams suggested he blacked out, and the next thing he remembers is waking up in the hospital.

---

[1] The trial court issued a judgment nunc pro tunc to correct the length of sentence in the initial judgment to reflect accurately the oral pronouncement that Allen's sentence be suspended and probated over a five-year period.

Williams did not remember anyone telling him to get out of the truck and could not identify the person who hit him. Williams acknowledged he was having trouble with his memory since he suffered a head injury in the incident.

**B. Testimony of Allen**

Allen was at the same bar that evening and had seen Williams earlier. Allen testified that Williams was intoxicated and had been kicked out of the bar but returned which required his removal again. Allen got ready to leave the bar about 10:30 p.m. As he approached his truck in the parking lot, he saw his truck door open with movement inside. He pushed the panic button on his key fob, but the man remained inside Allen's truck. When Allen looked inside his truck, he saw that it had been ransacked. He then ordered the man out of his truck. According to Allen, the man cursed at him, so Allen grabbed him and pulled him out of the vehicle. Allen testified he told the man twice to get out, and when he reached in to grab him, the man swung at him, so Allen "clocked him." Allen looked for a baton he kept in his truck, but it was not there. Williams then rolled over on his hands and knees and started to stand up. Allen did not know where his baton was, and he feared the man may have had the baton or some other weapon. Because Williams started to stand up again, Allen hit him in the back of the head behind his ear, and Williams fell back down.

3

Allen explained he pulled Williams out of the truck because he thought Williams was trying to steal it or burglarize it. Allen testified he hit Williams the first time after Williams swung at him. Allen told the jury he hit Williams the second time because he "was defending [his] property and defending [himself]." Allen admitted he hit Williams more than once, but he insisted Williams was never helpless and was in fact, conscious the whole time. Allen testified Williams kept trying to get up, and Allen hit him repeatedly to make certain he did not get back up.

## C. Testimony of First Eyewitness

Two witnesses who lived near the bar observed the altercation. The first eyewitness who testified was Wesley Walker. He testified that an alarm going off around 10 p.m. caught his attention. He heard voices, looked out his window, and saw two men having a confrontation. That said, Walker later testified that what caught his attention was Williams urinating at the back of a truck. He then observed Williams slide up the side of the truck, "drunk-like," open the door, and that is when the alarm went off. Walker identified Allen as one of the men involved in the confrontation. Walker testified he heard Allen tell the other man to get out of his truck and saw the other man put his hands up. Walker testified Allen hit the man, and the man stumbled backwards. Walker insisted that after Allen hit Williams the first time, Williams went down and was not fighting back, yet Allen continued to hit

4

him with his hand. Walker testified he did not observe Williams punch Allen, and Williams never got up from the ground. By the time Walker went outside, he suggested his neighbor, another eyewitness, had already told Allen to get off Williams. Walker testified that Allen went too far, and it did not appear to him that Allen was defending himself or his property.

**D. Testimony of Second Eyewitness**

The second eyewitness was John Kosik, who lived four houses down from the bar and who was outside working on his vehicle the night of the incident. Kosik said he could see the parking lot of the bar from his driveway. He observed a man getting into a white Chevrolet truck, and about thirty minutes later, he heard yelling and a disturbance at the driver's door of the truck. Kosik testified it began as an argument, and he saw a man climb out of the vehicle. Then, a man, whom Kosik identified as Allen, asked the first man why he was in Allen's truck, and they started pushing each other. Kosik testified that the first man tried to apologize "or something," then Allen hit him, and he fell to the ground. At first, Kosik testified when the man exited the truck, there was a pushing match, but he did not see both men swinging at each other. He just remembered the pushing and one hit. But Kosik admitted later in his testimony that on the 911 call, he stated that "they started swinging at each other" and witnessed "blows being thrown[.]" When Kosik arrived at the scene, it appeared

5

there was a man unconscious, not moving or fighting back. Kosik noticed a puddle of blood by the man's head. Kosik testified the other man was picking the man on the ground up with one hand and hitting him with his other. Kosik confronted Allen because he thought the other man may have been dead or that Allen was about to kill him if he did not stop. According to Kosik, Allen started a confrontation with him at that point and told him to mind his own business. Allen told Kosik the man got in his truck and was going through his stuff. Kosik confirmed the truck had been trashed on the inside. Kosik testified the drunk man had been in the vehicle thirty minutes before the confrontation began. Kosik said it looked like Allen was going to try to drive off, so Kosik told him to call the cops to get someone to help the guy on the ground.

**E. Testimony of Third Eyewitness**

Robert Aimes was in the bar with his wife the night of the incident. At one point earlier in the evening, they left the bar and noticed a man in a pickup truck. The same man was in the pickup when they returned to the bar. Later in the evening, someone told Aimes to see what was going on outside in the back. He saw Allen screaming with the man they saw in the truck earlier. When Allen went to pull the man out of the truck, the man swung at him. Somebody else broke up the fight. Aimes instructed Allen to stand at the front of the truck, and Allen complied. Aimes

6

testified that Williams was never unconscious. Aimes stood and talked to Allen at the front of the truck while they waited for police, and Williams started to run away, but he fell and hit his head on the back bumper of the truck. Aimes said Williams fell and hit his head again against the concrete when officers tried to place him in handcuffs, but police video did not show this.

**F. Testimony of Other Witnesses**

Other witnesses saw Williams drunk in the bar on the night of the incident. Witnesses also observed Williams fall and hit his head repeatedly through the course of the evening. Several witnesses from the bar viewed Williams in Allen's pickup, but they did not see the actual fight. These witnesses suggested Williams was conscious the entire time they observed him.

Officers testified at trial and police video revealed Williams appeared intoxicated. Officers testified it appeared the man entered the wrong vehicle, as he had a similar model white Chevrolet Z71 pickup parked a few parking spaces away. When the officers arrived, Williams was sitting on the ground and conscious. One of the officers testified it did not appear as if Allen and Williams were in a mutual fight, but Williams looked as if he had received the worst end of the fight. Officers confirmed Allen's vehicle was "trashed," and his belongings were scattered over the parking lot. Officers located the keys to Allen's deer camp in Williams's pockets.

7

They also found Allen's baton on the ground. One of the officers took Williams to the hospital for treatment, given his confusion and head wound.[2] Once he arrived at the hospital, they performed a CT scan, and Williams was diagnosed with severe head trauma.

A trauma surgeon who treated Williams after the incident testified Williams had a blood alcohol level of .167 at around 2:35 the morning after the incident. The doctor testified it was impossible for Williams to have had only three beers to drink. The doctor also testified Williams had a large subdural hematoma. The doctor reported Williams was unconscious when he arrived as a transfer from another local hospital, in danger of dying, and required an emergency craniotomy. The doctor could not say whether the subdural hematoma was caused by a trip and fall or because of some other trauma.

## G. Charge Conference and Jury Charge

At the charge conference, Allen objected to the proposed charge because it failed to provide an instruction on the law of self-defense and attached a proposed instruction. The State responded that the charge adequately covered the same language covered in self-defense, and Allen would have the defense of property with

---

[2] Although witnesses observed Williams fall and hit his head several times during the evening and independent of Allen hitting Williams, the cause of Williams's injury is not made an issue in this appeal.

8

the use of force deadly force. The State also argued that it was all tied into defending his truck. The trial court agreed with the State and overruled the objection, focusing on the fact that the conduct arose from an incident involving Allen's truck. The trial court explained that the instruction for self-defense was not warranted under the facts and would confuse the jury. The final charge submitted to the jury included instructions for the use of force and deadly force in defense of property, but the trial court did not include an instruction on self-defense in the charge.

## II. Standard of Review

We employ a two-step process under *Almanza* when reviewing jury charge error. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). First, we must determine whether there was error in the charge. *See Ngo*, 175 S.W.3d at 743–44. Second, we examine whether the appellant was harmed by the error. *See id.* The level of harm required for reversal depends on whether the appellant preserved the error by objecting at the trial court level. *Id*. at 743; *Ferreira v. State*, 514 S.W.3d 297, 300 (Tex. App.—Houston [14th Dist.] 2016, no pet.). If the appellant objected to the charge, we will reverse if we find some harm. *See Ngo*, 175 S.W.3d at 743 (citing *Almanza*, 686 S.W.2d at 171). But if the appellant failed to object to the charge, we

9

will not reverse unless egregious harm is established by the record. *See id*. at 743–44.

Because Allen properly preserved this issue by a timely objection to the charge and request for an instruction, we must reverse if the error is "calculated to injure the rights of [the] defendant[.]" Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). That means we must determine whether there was some harm. *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003) (citing *Almanza*, 686 S.W.2d at 171). The some harm standard requires us to find "the defendant 'suffered some actual, rather than merely theoretical, harm from the error.'" *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (quoting *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)).

### III. Analysis

Article 36.14 of the Texas Code of Criminal Procedure requires the trial court to provide a jury in a criminal case with "a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). Under the proper circumstances, a trial judge must instruct the jury on any statutory defense, including justification, raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–209 (Tex. Crim. App. 2007) (citing Tex. Penal Code Ann. §§ 2.03, 2.04 (West 2011)). "Thus, a defendant has the right to an instruction on *every* defensive

10

issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony raising the defense is not worthy of belief." *Johnson v. State*, 271 S.W.3d 359, 362 (Tex. App.—Beaumont 2008, pet. ref'd) (emphasis added) (citing *Walters*, 247 S.W.3d at 208–09; *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999)). This rule ensures the jury, not the trial judge, decides the credibility of the evidence. *Granger*, 3 S.W.3d at 38.

The applicable law of self-defense is

(a) Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:
> (1) knew or had reason to believe that the person against whom the force was used:
>> (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
>> (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
>> (C) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Tex. Penal Code Ann. § 9.31(a) (West 2011).

The law regarding the use of deadly force states:

(a) A person is justified in using deadly force against another:
    (1) if the actor would be justified in using force against the other under Section 9.31; and
    (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
        (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
        (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.
(b) The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:
    (1) knew or had reason to believe that the person against whom the deadly force was used:
        (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
        (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
        (C) was committing or attempting to commit an offense described by Subsection (a)(2)(B);

12

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

(c) A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section.

(d) For purposes of Subsection (a)(2), in determining whether an actor described by Subsection (c) reasonably believed that the use of deadly force was necessary, a finder of fact may not consider whether the actor failed to retreat.

Tex. Penal Code Ann. § 9.32. (West 2011).

During the charge conference, the State focused on the fact that the charge included an instruction on the use of force and deadly force to defend property, and argued the incident was all "tied into defending his truck and it was all one continuous action" and the trial court agreed. But a defendant is entitled to an instruction on *every* defensive issue raised by the evidence, no matter if the evidence is weak or contradicted. *Walters*, 247 S.W.3d at 209 (emphasis added); *Johnson*, 271 S.W.3d at 362. An instruction on defense of property does not guide or direct the jury on self-defense. *See* Tex. Penal Code Ann. §§ 9.41, 9.42 (West 2011). At trial, there was conflicting testimony and evidence. There is evidence that after Allen physically removed Williams from his vehicle, he hit Williams once and Williams

13

was subdued. That eyewitness also testified Allen continued to hit Williams after Williams was unconscious. In contrast, two witnesses, Allen and Aimes both testified Williams was never unconscious, and Williams swung at Allen when Allen pulled him out of the truck and before Allen struck Williams. Allen testified Williams kept trying to get up, and he was concerned Williams may have had his missing baton, a gun, or a knife. Indeed, although one eyewitness testified he believed Allen went too far, another confirmed he saw Williams and Allen swinging at each other and "blows being thrown."

While the trial judge properly instructed the jury on defense of property, it failed to instruct the jury on self-defense even though it had been raised by evidence. By refusing to instruct the jury on self-defense in addition to defense of property, the trial court commented on the weight of the evidence. *See Granger*, 3 S.W.3d at 38 (quoting *Woodfox v. State*, 742 S.W.2d 408, 410 (Tex. Crim. App. 1987) ("When a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury.")). Under a scenario such as this one, the jury could determine that Allen had neutralized Williams as a threat to his property by removing him from the vehicle, but Williams was a continued threat, or Allen reasonably believed Williams to be a threat, to his person. The jury did not have the

14

option of considering self-defense in addition to defense of property, although the law is clear Allen was entitled to an instruction on every defensive issue raised. *See Walters*, 247 S.W.3d at 208–09; *Johnson*, 271 S.W.3d at 362. Based on the evidence admitted in Allen's trial, Allen was entitled to have the trial court instruct the jury on whether he acted in self-defense of his person. The trial court erred when it refused Allen's requested instruction.

Having found error in the trial court's refusal to include a self-defense instruction in the charge, we must now determine if Allen suffered some harm. *See* Tex. Code Crim. Proc. Ann. art. 36.19; *see Ngo*, 175 S.W.3d at 743 (citing *Almanza*, 686 S.W.2d at 171); *Trevino*, 100 S.W.3d at 242. In analyzing whether there was some harm, we consider "'the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole.'" *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171).

Here, the State addressed self-defense in voir dire by providing the definition of self-defense to the panel. The State also questioned the panel extensively during voir dire about defending themselves, the reasonableness of the defense, and the context of the situation determining what was reasonable. There were certain

15

uncontroverted facts at trial--the incident occurred at night, the complainant was intoxicated, the complainant entered Allen's vehicle without his permission and ransacked the truck, and an altercation ensued. Although controverted, there was also evidence Allen feared for his safety after Williams swung at Allen before Allen struck Williams; Allen was unsure if Williams had a weapon, and not only was he defending his property, he was defending himself. In his closing statement, Allen focused on his right to defend himself and the fact that Williams began fighting while he was being pulled from Allen's truck. Without the requested self-defense instruction, counsel could not argue Allen's legal entitlement to an acquittal if the jury agreed. Although self-defense was presented repeatedly during arguments and voir dire, the jury was not allowed to consider it as justification for Allen's use of force during the incident. After reviewing the record in its entirety and the requested instruction in the light most favorable to the defense, we conclude Allen was entitled to a self-defense instruction and suffered some harm from the court's refusal to include it in the charge. *See Ngo*, 175 S.W.3d at 743; *Almanza*, 686 S.W.2d at 171.

### IV. Conclusion

The evidence presented at trial, though conflicting, raised the issue of self-defense. The trial court thus erred when it failed to include an instruction on self-defense in the jury charge. Allen preserved this issue by timely objecting to the

16

charge, and we have determined he suffered some harm as a result of the error. For these reasons, we reverse the judgment of the trial court and remand for a new trial on the merits.

REVERSED AND REMANDED.

_____
CHARLES KREGER
Justice

Submitted on June 5, 2018
Opinion Delivered August 29, 2018
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.